lision occurred through the negligence of the driver of the wagon.

The case was tried before the lower judge without a jury, and he rejected plaintiff's demands, giving the following as his reasons therefor, to wit:

"The plaintiff has not established her case with the certainty which the law requires, either as to the manner in which the accident occurred or the extent of the injuries. There was a collision in which plaintiff was as much or more at fault than defendant. The defendant observed the city ordinances, but plaintiff disregarded them. The evidence of the extent of the injuries was subjective.

"I feel that plaintiff has failed."

A careful examination of the record has not convinced us that the lower court was wrong. Regardless of whose fault it was that the collision occurred, the undisputed evidence is that the force of the impact was very slight; the bumper or fender of the machine struck the left hind wheel of the wagon in which plaintiff was riding, and pushed it about 12 inches at the most. Plaintiff was sitting on the seat in front with her daughter, and we do not see how it was possible for her to have been injured as she claims— that is, to have had three ribs broken. The lower court saw and heard the witnesses, but evidently did not believe them. We find no grounds for disagreeing with him.

Judgment affirmed, with costs.

---

(95 South. 400)

No. 25583.

STATE v. RINI et al.

(Dec. 29, 1922. Rehearing Denied Jan. 27, 1923.)

*(Syllabus by Editorial Staff.)*

1. Judges ⬩49(2)—That judge presiding at former trial has expressed opinion of accused's guilt does not disqualify.

That the judge presiding at the first trial of a murder case, and passing upon the motion for a new trial, has publicly and privately expressed his opinion as to defendants' guilt and has expressed his belief that they should be hanged, does not disqualify him from presiding at a second trial.

2. Judges ⬩51(3)—Allegations, in motion to recuse, as to inability to obtain impartial trial, held mere conclusions.

Allegations, in motion to recuse judge who had expressed his belief that defendants were guilty of murder, that he was so completely convinced of their guilt, and his attitude, opinions, and actions were so antagonistic to defendants, that it was impossible for them to obtain a fair and impartial trial before him, and that it was impossible for him to act in an impartial manner as guaranteed by the state and federal Constitutions, were but the expression of the pleader's conclusions as to the results flowing from the judge's expression of his belief.

3. Judges ⬩47(1)—That judge has discussed case with prosecuting witnesses or others not ground for recusation.

It is not illegal or irregular, and does not constitute a practice of law or the exercise of other than judicial functions in violation of Const. 1921, art. 7, § 3, and is not ground for recusing a judge, that he has, in his official capacity, discussed a criminal case with the prosecuting witness or any one else, especially where the issue of guilt or innocence has to be determined primarily by a jury.

4. Judges ⬩51(3)—Allegations, on motion to recuse, suggesting that discussions of case related to improper subjects, held mere conclusions.

Where motion to recuse judge, alleging that he had discussed the case with relatives of the deceased and others interested in the prosecution of the case, did not show that such discussion related to improper subjects, but left this entirely to inference or suggestion, such inferential allegations amounted to no more than the conclusions of the pleader.

5. Judges ⬩51(3)—Motion to recuse, alleging that judge's expressions of opinion would influence prospective jurors, held not to show ground for recusation.

A motion to recuse the district judge, alleging that he occupied a position of leadership in the parish and that his opinions had much weight, that his expressions concerning the case had caused prejudice against defendants and had caused the atmosphere to become so

charged with prejudice that jurors would sub-consciously and unwittingly yield thereto, and that his expressed opinions would amount to a discussion of the facts before the jury, even though he did not comment thereon during the trial and would imperceptibly influence the jury, *held* to show no cause for recusation.

**6. Judges ⬅⟿51(4)—Insufficient motion to recuse properly overruled without referring to another judge.**

Where motion to recuse the district judge because he entertained and had expressed his ·belief as to defendants' guilt alleged no cause for recusation, the court properly overruled it without referring the matter to another judge.

**7. Criminal law ⬅⟿134(4)—Evidence insufficient to show fair and impartial trial could not be had.**

In a murder case, which had been once tried and had caused some excitement and discussion, evidence on motion for a change of venue, alone or in connection with the evidence, on a motion for a new trial, concerning the attitude and feeling of the populace towards defendants after the verdict, *held* insufficient to show that defendants could not or did not receive a fair and impartial trial.

**8. Criminal law ⬅⟿126(2)—That case has excited interest and been discussed not ground for change of venue.**

That a murder case has excited the interest of the residents of a parish, and has been discussed more or less throughout the parish, is not ground for a change of venue.

**9. Criminal law ⬅⟿126(1) — Test of motion for change of venue stated.**

On motion for a change of venue, the test is whether there can be secured, with reasonable certainty from the citizens of the parish and under the safeguards of the law, a jury whose members will be able to try the case upon the law and the evidence, uninfluenced by what they may have heard of the matter, and who will give accused the full benefit of any reasonable doubt which may arise from the evidence or lack of evidence.

**10. Criminal law ⬅⟿126(2)—That those who have heard evidence have no doubt of defendants' guilt not ground for change of venue.**

That there is no doubt of defendants' guilt in the minds of any of those who have heard the evidence in a murder case which has been once tried, including the trial judge, does not entitle defendants ·to a trial in another jurisdiction.

**11. Jury ⬅⟿103(13)—Jurors having opinions, but testifying that they could disregard them and decide according to the evidence, held not disqualified.**

Jurors who testified that they had formed opinions in a murder case ·from newspaper reports or hearing the case discussed, and some of whom testified that it would take evidence or strong positive· or convincing evidence to remove such opinions, but who also testified that they could disregard their opinions and decide the case according to the law and the evidence, *held* not disqualified.

**12. Jury ⬅⟿131(18)—Testimony on voir dire of one having opinion held to show that he was not disqualified, regardless of answer to particular question.**

The testimony on his voir dire of a juror who had formed an opinion *held* to show that he was not disqualified, whether his answer to the question, "Are you sure it (his opinion) would not influence you in any way?" was, "Yes," as understood by the trial judge, or, "No," as understood by the stenographer,. it being evident that he intended to answer the · question in harmony with his other testimony, that his ·opinion would not influence him.

**13. Criminal law ⬅⟿783(1)—Court held not to have erred in charge limiting evidence of defendant's statements.**

On the trial of several defendants for murder, where testimony was admitted with respect to statements, admissions, and confessions of the different defendants, the court *held* not to have erred in refusing charges that such testimony was offered only to prove the making of such statements and not their truth, and in charging instead that the evidence was offered only as against the defendant making the statement, and might be given such weight against him as the jury deemed proper, but was not to be considered as against any other defendant.

**14. Criminal law ⬅⟿407(1), 1169(12)—Statements in defendant's presence while under arrest rendered admissible and their injurious effects removed by defendant's confession immediately following.**

Statements of third persons in the presence of defendant while under arrest, to which he made no response, would, standing alone, have been inadmissible, but where, immediately following such statements and after the exclu-

sion of the persons making them from the room, defendant, without inducement or coercion, corroborated the statements in every detail, and even incriminated himself further, the whole circumstances were admissible and any injury which might have been done without the confession was obliterated.

**15. Criminal law ⚖══1064(5)—Ground for new trial that verdict was contrary to law and evidence cannot be considered by Supreme Court.**

The claim on motion for new trial that the verdict was contrary to the law and the evidence is not cognizable by the Supreme Court.

O'Niell, J., dissenting in part.

Appeal from Twenty-Fifth Judicial District Court, Parish of Tangipahoa; Robert S. Ellis, Judge.

Joseph Rini and others were convicted of murder, and they appeal. Affirmed.

See, also, 151 La. 163, 91 South. 664.

B. B. Purser, of Amite, A. D. Henriques and George J. Gulotta, both of New Orleans, and W. B. Kemp, of Amite (Chandler C. Luzenberg, of New Orleans, of counsel), for appellants.

A. V. Coco, Atty. Gen., and Matt J. Allen, Dist. Atty., of Amite (Amos L. Ponder and Robert R. Reid, both of Amite, and T. S. Walmsley, of New Orleans, of counsel), for the State.

By the WHOLE COURT.

DAWKINS, J. Defendants, six in number, appeal from a conviction of murder and sentence of death. Numerous issues are raised by the record, and we shall proceed to consider them in their proper order.

### Motion to Recuse the Trial Judge.

Defendants were once before convicted and sentenced to be hanged, but a new trial was ordered upon appeal to this court. Before going into the case a second time, a motion to recuse the lower judge was filed and overruled, and this presents the first matter which we are to review. The motion is not mentioned in the original brief, but was urged in oral argument and in a supplemental brief filed since the case was submitted.

We shall take up the first and third grounds of the motion together, since they involve similar points. It is charged:

(1) "That Hon. Robert S. Ellis has on numerous occasions discussed this case openly and publicly with the citizens of Tangipahoa parish, La., expressing his belief that your defendants were guilty of said charge of murder and should be hanged."

(3) "That said Hon. Robert S. Ellis, judge of this court, as these defendants believe and aver upon observation and information, is so convinced and believes so completely in the guilt of your defendants, that his attitude, opinions, and actions are so fixed, open, and antagonistic toward your defendants that it is impossible for your defendants to obtain a fair and impartial trial as long as the said Hon. Robert S. Ellis acts as presiding judge in this cause; and a presiding judge in a criminal case in Louisiana being, in effect, a thirteenth juror with veto power, and the said Hon. Robert S. Ellis having a fixed opinion as to your defendants' guilt, expressed both orally and in writing, in public and private, it is impossible for him to act as presiding judge in the trial of this cause in that impartial manner guaranteed to these defendants by the Constitution of the United States of America and the Constitution of the State of Louisiana."

[1, 2] The sum and substance of these allegations is that the judge has formed and expressed an opinion publicly and privately of the guilt of the accused. When it is considered that he was the presiding judge at a former trial of this same case, it is to be expected that he had and has an opinion upon the subject, and that he should have expressed it publicly. He saw and heard the witnesses and arguments of counsel, and was required, as a legal duty, to pass upon the question of innocence or guilt in disposing of the motion for a new trial which was urged at that time; and we can see no more harm to defendants in expressing that same opin-

ion privately, based, as it must have been, upon the former hearing. If he expressed the belief that accused should be hanged, it amounted to nothing more than the statement of a legal result which the law itself imposed as a consequence of the former verdict, and which was the necessary effect of his former ruling. It is to be presumed that if the second trial developed the same facts and issues as the former one, his conclusions would be the same; yet we do not think it can be seriously contended that a trial judge is disqualified from again sitting in a case because of his having presided at the first trial. The allegations otherwise in these two paragraphs of the motion are merely the expression of strong conclusions by the pleader upon the result which it is claimed flows from the facts charged, which we have just discussed, and, we think, disclose no ground for recusation. In fact, our recollection is that one of the counsel for defendants, in oral argument, conceded that the having of an opinion of accused's guilt and the expressing of it would not disqualify the judge.

[3, 4] We next take up the second charge, in which it is said:

(2) "That the said Hon. Robert S. Ellis has discussed this case with the relatives of the deceased, Dallas L. Calmes, and those interested in the prosecution of the case, the prosecuting and other prospective witnesses, as to their testimony, and has privately conferred and advised with the attorneys representing the state in the prosecution of this cause."

In their supplemental brief, counsel for defendant first quote and rely upon the following provision of article 7 of the State Constitution:

"Sec. 3. No function shall ever be attached to any court of record, or to the judges thereof, except such as are judicial; nor shall such judges practice law."

We gather from the argument it is contended that in charging the judge with consulting and advising with the relatives of the deceased, prosecuting witnesses, and with the counsel for the state, the effect is the same as to say that he has assumed the role of an advocate for the commonwealth, in violation of the section of the Constitution just quoted. However, as was said in the recent case of State v. Judge (No. 25553) 94 South. 389,[1] under ordinary circumstances, there is nothing illegal or irregular in the judge discussing with the prosecuting witnesses, or any one else, a criminal case, in his official capacity, especially where, as here, the issue of guilt or innocence has to be determined primarily by a jury. On the contrary, it becomes his duty at times to do so, as in cases where he is applied to for making affidavits for warrants of arrest, or where a witness may be under apprehension as to his safety, or may know of any improper action or conduct of any one calculated to affect the trial; and the same is true with regard to his consulting with either counsel for the state or the accused, or any one else. It could hardly be said that in doing so he was either practicing law, or discharging any duties other than such as were judicial. A criminal case is not one between the deceased or his relatives and the accused, but the state, representing the sovereignty of the entire people, it is who hales an accused into court; and the judge by his oath and training is presumed to be insusceptible to such influences as affect the layman, called to decide a single case and unfamiliar with the theory and principles of the law. It will be observed that the charge states no facts as to improper conduct or subjects of discussion by the judge with the classes of persons named, but the bare fact of such consultations, leaving entirely to inference or suggestion that they were upon matters improper and prejudicial to the rights of accused. We think therefore that they amount to nothing more than the conclusions of the pleader upon allegations

---

[1] 152 La. 768.

which, within themselves, constitute no cause for recusation.

[5] The fourth, fifth, sixth, and seventh charges of disqualification set forth that the presiding judge, by virtue of having been district attorney from 1900 to 1908, and judge in said district from the latter date to the present time, occupies a position of leadership among the people thereof, and that his opinions are freely discussed, quoted, and given much weight; that his open and hostile expressions have caused an "under current of prejudice to run in the public mind against your defendants," and the atmosphere has become charged with said feeling of prejudice to such an extent "that many jurors, otherwise qualified, would subconsciously and unwittingly yield to the prejudicial influence with Hon. Robert S. Ellis presiding"; that because of the public interest in the present case, his said opinions have been generally discussed among the citizens from whom the jury must be drawn, and the situation "would be tantamount to a discussion of the facts before the jury even though the said presiding judge did not comment on said facts during the trial of this cause"; and that, regardless of his attempt to be fair, his said opinion and expressions would "imperceptibly influence said jury in reaching a decision adverse to your defendants." That the attitude of said judge toward defendants did not become apparent until during the former trial, and defendants did not believe that his mind was so fixed as to their guilt until after said trial and sentence. "That it is not the desire of the accused or their counsel in the filing of this motion to reflect upon the intelligence, integrity, or honesty of Hon. Judge Robert S. Ellis, yet they verily believe that by his said words and actions that he has placed himself in such a position that he should be recused from presiding in this case as trial judge."

The charges embraced in these four para-153 LA.—3

graphs of the motion are largely an elaboration of the first two quoted herein, and argumentative of the results or conclusions which the pleader claims will flow therefrom. Nowhere do they charge the judge with personal animosity toward the accused as such, or with anything other than that he has formed and expressed an opinion of their guilt. The same arguments would be applicable to any other case where the judge (presumably always a man of standing and influence in the community) had been called upon to make a ruling in a case exciting public interest, upon a motion for a new trial; and, in our opinion, they recite no facts which show a cause for recusation.

It is but natural that all good citizens should be opposed to the commission of a crime such as the one charged by this record; but it does not necessarily follow that they are prejudiced against the individuals charged with its commission, or that a jury, drawn from the body of such citizens, would disregard the law and their oaths, requiring the proof of the guilt of the persons accused beyond a reasonable doubt.

The law (Acts Nos. 40 of 1880 and 35 of 1882) lays down specific grounds for the recusation of a judge, only two of which, having application to this case, we quote:

"First. His being interested in the cause.
* * * "

"Third. His having been employed or consulted as advocate in the cause."

It is true that in State v. Banta, 122 La. 235, 47 South. 538, in a nonappealable misdemeanor, triable before the judge without a jury in which he had to decide all of the questions of fact and law exclusively, we held that a charge that the judge was the personal enemy of the accused was not frivolous and presented an issue requiring him to refer the matter to another court for decision of the motion to recuse. However, that

case went as far, in construing the meaning of the provision for recusing a judge "interested in the cause," as we would care to go; and not only is there nothing in the present motion intimating a personal animus on the part of the judge, but such a feeling is expressly negatived by the movers.

[6] Our conclusion is, therefore, that the motion did not allege a cause for recusation, and the lower court was correct in overruling it without referring the matter to another judge. State v. Blount, 124 La. 202, 50 South. 12; State v. Hayes, 127 La. 764, 53 South. 983; State v. Morgan, 142 La. 764, 77 South. 588.

### Motion for Change of Venue.

[7-9] The evidence taken upon trial of the motion for a change of venue consumes 190 pages of an otherwise voluminous record, and involves the testimony of some 28 witnesses for the defense and 16 for the state. They came from different parts of the parish, and it was shown that the case had excited the interest of the residents, and, owing to its importance and the circulation of local newspapers together with those published daily in the city of New Orleans, had been discussed more or less throughout the parish. But, in this respect, the conditions do not appear to have been any different from what they would be in any other part of the state or country, where a case of such nature is covered by the modern newspapers with present day facilities for circulation and distribution. If such a situation alone could be said to disqualify the citizenship of a parish from serving as jurors, accused persons could scarcely ever be tried in the venue of the crime in cases of the kind now before us; and the same handicap would be found, only perhaps in a lesser degree because of lack of knowledge of the parties concerned, in every other parish of the state. But the showing thus made is not conclusive. It is only a circumstance to be considered in determining the prevailing state of mind in the parish where the case is pending. The test is: Can there be secured with reasonable certainty from the body of such citizens, with the use of the safeguards of the law, a jury whose members will be able to try the case upon the law and evidence adduced on the trial, uninfluenced by what they may have heard of the matter, and who will give the accused the full benefit of any reasonable doubt which may arise from either the evidence or the lack of it?

We are impressed with the frank way in which both the witnesses called upon the trial of the motion for a change of venue, and the veniremen called for examination on their voir dire, answered the questions propounded to them. There seemed to be no disposition to withhold anything, whether favorable to one side or the other. Of the 44 witnesses called, all admitted the case had attracted attention and been discussed more or less, and that the former verdict was uniformly approved; but both in the opinion of the witnesses (with a few exceptions which we shall hereafter discuss) and from the facts which a liberal examination and cross-examination developed, there appeared little or no prejudice against the accused as individuals, or any desire that they should receive anything other than a fair and impartial trial.

The defense, as it had a right to do, the record indicates, had one or more individuals go about the parish for the purpose of sounding the sentiment of the people upon the subject; but little was developed to sustain the idea of a prejudiced attitude, although we are convinced there was no attempt to hide the true situation. Again, it was sought to be shown that there was feeling against the accused because of their Italian nationality, but the only thing developed along that line was that in a limited area around Poncha-

toula in the lower end of the parish property owners would not sell or lease land to Italians because their method of packing strawberries (which was one of the principal crops grown there) reduced the price, berries raised in that community commanding from 25 to 50 cents more per crate than those shipped from places where they were packed by Italians. On the other hand, it was shown that, since the homicide for which accused were tried, an Italian, born in Italy, had been elected, by a vote of more than two to one over a native-born American, mayor of Independence, the village in which the crime was committed, notwithstanding the majority of the electors were non-Italian. The testimony of this officer, together with that of another prominent witness of Italian birth, was to the effect that there was no prejudice against them as a nationality; and it does seem that if it were not so, with the considerable Italian population residing in Tangipahoa parish, it would have been possible to have made the fact known.

We will now discuss the testimony of those witnesses who said, thought, or whose testimony indicated that they felt that accused could not get a fair trial.

When the jury was being selected on the former trial, Adjutant General L. A. Toombs was sent by the Governor to Amite, with the view that if conditions should warrant, military protection might be afforded against mob violence. He had a machine gun company ready in New Orleans and troops in the town of Bogalousa, which could have reached the place of trial within three or four hours upon telephonic or telegraphic notice. This officer remained on the scene three days of the first trial, and finding it unnecessary to summons the troops or for him to continue there, departed and did not return for the second trial; it being considered no doubt such a precaution was unnecessary. General Toombs gave it as his opinion that those with whom he came in contact were convinced the accused were guilty, and his examination further upon the point was as follows:

"Q. From your experience at the time and the expressions you heard, do you think it possible for us in reason to get a jury in this case from this parish which will have so little knowledge of the testimony heretofore taken that they can give the six accused a perfectly fair and impartial trial?

"A. I don't believe that I can honestly say. I don't believe that my impression would be worth much because I was in the courtroom pretty much all the time, in the courtroom and about the court grounds here. I don't know anything about what was or is going on outside of the courthouse.

"Q. Taking the impression made upon your mind by those who were in and about the courthouse, and who expressed themselves in your presence, from those expressions could you say whether or not these people could get a jury which would be fair and impartial?

"A. I couldn't say whether they would (be) fair and impartial or not; but I think I know what you want of me. You want to know whether I have acquired the impression from my time here that it would not be practicable or possible for you to get a jury of fair and impartial men in this parish who have not heard this case to such an extent that they have not formed opinions. Is that the idea?

"Q. That's the idea; yes, sir.

"A. I don't believe they could."

#### "Cross-examination.

"Q. General, how many people did you hear express themselves; of course, I don't mean the exact number, but about how many people did you hear express themselves?

"A. I couldn't say, of course—I naturally discussed it.

"Q. When you expressed the opinion that they could not get a fair and impartial trial, a fair and impartial jury in the parish, you based that on what you heard from those people you came in contact with at that time?

"A. I did not say that you could not get a fair and impartial jury. I qualified that by saying that the extent of my knowledge was not such as would include the entire parish. I mean I do not believe you could find 12 men in the parish who had not heard enough of the

trial to have practically made up their minds one way or the other.

"Q. And that is based upon what you heard from those people with whom you came in contact here in and around the courthouse?

"A. Yes, sir; and my observation.

"Q. But of those citizens of the parish who did not come to the courthouse you have no knowledge?

"A. None in the world. I am speaking from an observer's standpoint entirely."

It is thus seen that the witness, who found the situation such as not to require him to stay through the entire trial, and who never came back the second time, did not pretend to say that accused could not get a fair trial; the extent of his opinion being that 12 men could not be had who had not made up their minds "one way or the other," which is the same as saying, who had not formed opinions—this, too, based upon the contact with only that portion of the people who expressed themselves or whom he observed during the three days he was present.

Robert Stanga, called for the defense, testified in part as follows:

"Q. What opinion was there that generally prevailed?

"A. The sentiment over there is that they are dagoes and should be got rid of. That's the general situation as I understand it.

"Q. Do you believe from what you have seen that these people, these six Italians, could get a fair and impartial trial in this parish?

"A. From what I have heard, I wouldn't think so, but I couldn't speak for all of the people in the parish, because I would have to have the power to examine and see a few hearts, and that is a power I haven't got; but from the sentiment I have heard, I wouldn't think so. The average expression I heard was fixed, and when a person once makes up their mind, they are not so open as those who have not already made an opinion."

Further examination of this witness developed that he was from the lower end of the parish, and his discussions, in the main, had been with persons residing in that section, and at Ponchatoula and Hammond. He said he thought he would make a fair and impartial juror, but had no desire to be one. He does not attempt to speak for the whole parish.

Andrew Stanga keeps a boarding house at Ponchatoula and had heard people from different parts of the parish discuss the case, and who thought the accused were guilty; but when pressed on cross-examination, admitted that they came "mostly from Hattiesburg (Miss.), Covington, New Orleans, Baton Rouge," and Madisonville. In reply to the direct question as to whether he thought it possible to get a fair jury in the parish, his reply was: "I don't know about that. I don't think." And as to whether he believed: "I don't know." He said that he had attempted to sell some property near Ponchatoula to Italians, and that the people there would not let them buy.

H. C. Hoover had heard the case discussed, and those discussing it thought accused guilty. He did not believe that any one could be gotten who had not made up his mind one way or the other. His residence was in the Eighth ward, adjoining the one in which Ponchatoula is situated, and he was aware of the condition heretofore referred to which kept Italians from acquiring property in the vicinity of Ponchatoula. Being further interrogated, he testified as follows:

"Q. If you were accepted and sworn as a juror to try this case, couldn't you give these parties a fair trial, and base your verdict only on the evidence you heard on the trial and nothing else?

"A. Well, Judge, I could; but to tell you the honest truth, a feller would be kinder afraid.

"Q. Afraid of what?

"A. Well, he would be afraid if the dagoes would be tried and the state could not prove that they killed Calmes, and then he would be afraid to acquit the dagoes because the people would hang him in place of the dagoes. That's what I heard some talk about."

Being pressed on cross-examination, he reluctantly admitted that the expression referred to last might have been used by Rob-

ert Stanga, whose testimony we have referred to above. His testimony otherwise indicated that he had not had a very great opportunity to talk with people over the parish generally, and what he had heard was about the time of the former trial.

Joseph Reid, from the Fifth ward, had heard some of the people discuss the case and express opinions, but others did not; but from what he had heard, did not believe that a jury could be gotten who had not a fixed opinion. He admitted that he had been visited · by one Thomas Bennett, a preacher, who, several other witnesses said, had called upon them and inquired as to whether they thought accused could obtain a fair trial in the parish, but Reid denied that Bennett had said anything to him about the case.

Norman Core was an agent of the state department of conservation, connected with the forestry division, and who lived in Folsom in St. Tammany parish. In the course of his duties, he had had occasion to visit Tangipahoa parish every two weeks, and had been doing so for about a year prior to the second trial. Had heard the case generally discussed, and the people thought the accused were guilty, and he did not think they could obtain a fair and impartial trial. On cross-examination, after having explained to him the condition of mind a juror should have, said that he would not care to say whether a jury could be gotten or not; that it might be done if they were picked out, but the people generally with whom he talked thought the accused were guilty.

There were others that thought most people, who had read the newspapers or heard of the evidence developed on the former trial, had formed an opinion; but the great majority of the witnesses, and the evidence otherwise, including the circumstances surrounding both the first and second trials, indicated that the prevailing sentiment of the parish was that the accused should have the benefit of all the orderly processes of the law; and this, notwithstanding the trial and conviction of one individual for attempting to bribe jurors during the first trial, as well as certain provocative remarks by one of the accused following the second conviction. Newspaper men of long experience in such matters, as well as others who witnessed the trials, were struck with the orderly conditions and the total absence of expression of feeling or resentment toward the accused, who were daily carried by the sheriff back and forth to the jail and courthouse, for more than two weeks at a time.

[10] There seemed to be no doubt in the minds of any one who heard the evidence, including the trial judge, of the guilt of the accused; but the facts and circumstances establishing that condition were of the defendant's own making. This would not entitle them to a trial in another jurisdiction, unless there were added thereto a feeling of prejudice on the part of those drawn for jury service which would influence them in arriving at a verdict. There were 290 men summoned for jury duty the first time, out of a possible 3,000 to 3,500; and it was estimated that not much more than 500 of these attended that trial; leaving something like 2,500 or more from which to draw the second time. We are informed by the brief of defendants and the motion for a new trial that 580 veniremen were summoned for the second trial, 183 of whom did not appear, leaving 397 who actually responded. Of this number, 244 had attended the former trial or had fixed opinions. Out of the remainder 36 were peremptorily challenged, when the court had refused challenges for cause, and were covered by bills of exception which we shall later consider. This left an equal number of peremptory challenges, which accused must have used upon men who, from examination, they did not think were qualified. There remained 81, but we are not informed how many of its 36 challenges were used by the state, yet if it took all, this would still

leave 45, of which number the court must have excused 33 for cause, and if the state did not exhaust its whole quota, the number in the latter category were proportionately increased. In view of the character of the case, and the fact that it had been tried once before, there would appear, to one experienced as a trial judge, nothing in this situation to stamp it as at all unusual.

In the motions for a new trial, certain allegations were made and proof administered as to what took place on the day the second verdict was rendered, which, it is said by the defense, throws light upon the attitude and feeling of the populace toward the accused. The judge had said that he intended to keep the accused in the local jail, until the motion for a new trial had been disposed of; but, after conviction, the sheriff called his attention to the weakened condition of the jail, and asked that he be permitted to take them away. After a personal inspection, the judge was convinced that it was best to send, the prisoners back to the city of New Orleans for safe-keeping. This was a few minutes after the verdict had been pronounced, and a number of spectators were scattered over the courthouse yard, some 25 or more being in the vicinity of the jail. Recalling that he had announced his intention to keep the accused in Amite, the judge called all of those who were about the yard to see the condition of the jail, and announced that he had decided it best on that account, and because of the expense of keeping guards, to send the accused back to New Orleans. Some of the bystanders expressed the fear that the prisoners would be turned loose or get away if sent to New Orleans; but after explanations from the judge that this could not be done, and the request of relatives of deceased that the judge's judgment be acquiesced in, the crowd dispersed, with the exception of one individual who seemed not to be satisfied, but who was in- duced to leave by one of the counsel for the state. It was asserted through the press that the "mob" was desirous of lynching the accused, but this idea was thoroughly refuted by the proof, and the prisoners were carried to the depot and sent to New Orleans by the sheriff and deputies who had had them in charge throughout the trial, notwithstanding the bulk of the crowd was yet present in town and at the station, and notwithstanding the further fact that it had become known and circulated among them that one of the accused had asserted when leaving the court-room after conviction, that "this was the second time this has happened, but we still have money to fight," or words to that effect, and not the slightest hostility was displayed toward them.

We are convinced, therefore, after a thorough and painstaking examination of this record, that the accused could get and did receive a fair and impartial trial, in so far as the body of the citizenship from which the jury was drawn was concerned, and that the lower court was correct in denying the change of venue.

### Bills to the Overruling of Challenges to Jurors.

[11] There are 37 bills in the record to the overruling of challenges for cause of jurors by the lower court. Fifteen of these bills are discussed specifically in the briefs of defendants, and will be so treated by us; the others we shall group together, as they involve practically the same character of examination, result, and ruling.

### Bill No. 1.

G. B. Donahoe was called on his voir dire, and, being asked if he had heard enough of the case to form an opinion, said that he had. As to the character of that opinion, he said it was slight; that if taken as a juror he would disregard it and decide the case solely

upon the evidence adduced upon the trial, and would give accused as fair and impartial a trial as if they were of his own nationality. On being examined by the defense, said he had not attended the former trial; that he had an opinion which it would require evidence to remove, and then:

"Q. Would it require strong, positive, and convincing evidence to remove it?
"A. Yes, sir; it would take good evidence."

That he had formed his opinion shortly after the homicide and had had it for 10 or 11 months; had discussed the case with some of those with whom he worked a few days before; that neither he nor they expressed their opinions; and counsel again reiterated his questions about the necessity for strong evidence to change his opinion, asking if it would have to come from a particular side, which was answered in the affirmative. The juror was then examined by the court, who explained the legal requirements of a qualified juror, and was again assured by Donahoe that, if accepted, he could and would entirely disregard his opinion and decide the case upon the law and the evidence.

We find no error in the ruling.

## Bill No. 2.

L. H. Busby testified that he had read accounts of the homicide in the newspapers, but had not discussed it with any one who purported to know the facts or details; that he had formed an opinion as any one would from hearsay; if accepted as a juror he would be governed by what he thought was the truth; that he had no bias or prejudice; that there was no reason why he could not be a fair and impartial juror, and that if instructed by the court that the burden was upon the state to prove the guilt of the accused beyond a reasonable doubt, and if it did not do so it would be his duty to acquit, he would obey such instruction of the court. On examination by the defense, said he was a tally-man for a lumber company, residing in the parish about 14 months; did not know the deceased or his relatives; that he read of the case about the time of the former trial, but had not thought of it since, except when he saw it mentioned in the newspapers; that it would require evidence to remove his opinion, but, as before stated, he could base his opinion "on the evidence given on the new trial"; the evidence would have to be positive to change his opinion; and had heard others express the same opinion as his own. Further examined by the court, he said his opinion was not fixed, and that he would not be influenced by it in making up his verdict.

We find no error.

## Bill No. 3.

W. E. Dyson lived at Kentwood, and had heard of the killing at the time it happened; no one who claimed a knowledge of the case nad discussed it with him; had read accounts of it; was in Amite one afternoon of the former trial, but could not get in the courtroom; had formed an opinion, but it would not influence him in reaching a verdict if accepted as a juror; had no bias or prejudice and could give accused the same fair trial as one of his own nationality. Examined by the defense, said he had followed the trial closely through the newspapers; based his opinion on what he had read and what he had heard of its discussion generally; would still have the same opinion until removed by the evidence; being asked if it would have to come from a particular side, said, "either side," that it would not necessarily have to be strong, that he had no strong opinion; and, being pressed to know whether it would require strong evidence to remove his opinion, said he did not know how counsel wanted him to answer or which way to answer. The court then asked if he had such an opinion as would influence his verdict, and he replied that he did not.

No error is shown.

### Bill No. 4.

J. W. Naul also lived in Kentwood, had heard of the killing shortly afterwards, read accounts of it in newspapers, but was not present at the former trial; had an opinion, but it would not influence him if accepted as a juror; had no bias or prejudice and felt that he could give accused a fair and impartial trial. To the defense, he answered that he did not know the deceased or his relatives; lived in Kentwood 23 years, and operates a business in Ponchatoula, opened 25th of March, 1922 (the examination being in May); that one of the jurors on the former trial had had supper at his house the night of the first verdict and discussed the case with him at the supper table; he kept up with the case, had an opinion, but would disregard it if accepted as a juror. The record shows that he did not know deceased or his family, took no interest in the case other than any one else keeping up with the news, was a man of business experience and intelligence, and we find no error in the ruling denying the challenge for cause.

### Bill No. 5.

John Deitz had lived in Ponchatoula 18 months, coming from Livingston parish; had gone to the place of the homicide on the day it happened; had not discussed it with any one who had knowledge of the facts; read accounts in the newspapers; never attended the former trial, and had an opinion; that his opinion would not influence him if accepted, but would entirely disregard it; and was not acquainted with deceased or his relatives. On examination by the defense, said he had followed the case in the press; had not discussed it with any member of the former jury; and had an opinion which would require strong evidence to remove. To the court he answered that he would not allow his opinion to affect his verdict, but would entirely disregard it and

decide the case on the evidence adduced on the trial.

We find no error.

### Bill No. 6.

J. W. Hart had lived in Kentwood 15 years; had heard of and discussed the case with a number of people, and had also read of it; never attended the former trial; had only a slight opinion, based on reading the newspapers, and, if accepted as a juror, could and would disregard it and consider the case entirely on the testimony; had no prejudice or bias and knew no reason why he could not make a fair and impartial juror. To counsel for the defense, he said it would take evidence, strong evidence, to change his opinion. When asked by the court what he understood by the examination just made by counsel for the defense, said he thought they meant to ask whether he would be governed by what he had heard or the evidence, and that he would be controlled by "the evidence I heard," and that his "private opinion would have no weight in a case of that kind," and that he was sure he would disregard it if accepted as a juror.

There appears no error.

### Bill No. 7.

G. W. Stubbs had also lived at Kentwood about 5 years and had been raised in New York; heard of the killing, but no one discussed it with him who purported to know the facts; was not at the former trial, but had an opinion based on what he had read; if accepted as a juror, would entirely disregard his opinion and determine the case solely on the evidence; and had no bias or prejudice against accused on account of their nationality. To the defense, he answered that he did not know the deceased or any of his family; had talked to some of the former jurors, he thought, but not about this case; he followed the case in the newspapers

and from which he formed his opinion; thought it would require strong evidence to change it, but not from any particular side; his opinion was a pretty strong one which would require evidence to remove. Examined by the court, he said his opinion would not influence his verdict, but that he would lay it aside and decide the case entirely on the evidence produced on the trial.

No error.

### Bill No. 8.

A. L. Wallace had lived in the town of Kentwood 19 years, but never attended the former trial; read reports of it in the newspapers; never discussed it with any one who claimed to know the facts; had an opinion, but would disregard it and try the case on the law and the evidence; and he knew of no reason why he would not make a fair and impartial juror. In answer to questions by the defense, he replied that he had heard of the homicide shortly after it happened; did not know deceased; read the newspapers and followed the case closely, discussed the case shortly after the last trial; came in contact with one of the jurors; did not remember whether they discussed the case or not, but supposed they did; that it would require evidence, pretty strong evidence, to remove his opinion. In response to examination further by the court, said he would totally disregard his opinion, and be uninfluenced by it, if accepted as a juror; that he had no prejudice, and the fact that accused were Italians would make no difference.

There appears no error.

### Bill No. 9.

Clarence Hutchinson lived in the town of Tangipahoa; did not attend the former trial; read the papers, but never discussed the case with any one who knew the facts; had formed an opinion, but never expressed it; if accepted as a juror he would not be influenced by his opinion; that his mind was perfectly free and unbiased; never saw deceased in his life, nor was he related to him. To the defense: Had read of the case in the press, and had an opinion based thereon; never discussed it with any one; heard people speak of it as he passed along; if the evidence was sufficient, it would remove his opinion; "a man has to go by the law and the evidence before him;" if it was strong enough, the opinion would be removed; if not, it would remain. After an examination by the court in which the juror seemed to get confused, stating at one time that he did not know whether the opinion would influence his verdict or not, the judge explained to him the requirements of the law with reference to the burden upon the state to prove guilt beyond a reasonable doubt, and the juror then stated that he would try the case solely upon the evidence, uninfluenced by his opinion.

Taking the examination as a whole, we do not think a disqualification was shown.

### Bill No. 10.

C. E. B. Davis lived in the First ward; did not attend the former trial, but read an account of it; had not discussed the case with any one who claimed to know the facts; said that he had a "newspaper" opinion, but if accepted, would disregard it and decide the case on the law and the evidence; his mind was perfectly free and unbiased toward either side, and had no prejudice against Italians. To the defense: It would take evidence to remove his opinion; if he did not hear evidence, would be of the same opinion still; and if there was any evidence to show his opinion was wrong, "that's the end of my opinion." To the court: He would try the case solely upon the evidence, uninfluenced by his opinion.

The ruling was correct.

### Bill No. 11–A.

H. S. Dunn lived at Roseland, Third ward; had read something of the case in the papers; never discussed it with any one claiming to know the facts; had an opinion, but could and would disregard it, if accepted; and had no prejudice against Italians. To the defense: Did not know the deceased nor the members of his family or intimate friends so far as he knew; once in a while read something of the case in the newspapers; had not talked to any one of the former jurors; had a strong opinion which would require strong evidence to remove; never expressed that opinion; and the evidence would not have to come from any particular side. To the court: If taken as a juror, he could and would try the case solely on the evidence.

Ruling correct.

### Bill No. 11–B.

W. L. Stafford also had lived at Roseland about 18 months; raised in Washington parish; heard of case but never read newspapers; had had discussions with people about it from time to time; had not formed a "solid" opinion, and if taken as a juror would lay aside his opinion and decide the case on the evidence; had no prejudice because of defendants' nationality, and would give them a fair and impartial trial. In answer to the defense, said he had a kind of opinion, but never heard anything of the evidence; would take evidence to remove it; and did not know deceased or any of his relatives. To the court: He would lay aside his opinion and decide the case solely on the evidence.

Ruling correct.

### Bill No. 12.

Ben Gill lived at Natalbany, Sixth ward, past 12 years, but was a native of Mississippi; was present at former trial; had read some of the newspapers, and heard discussions of the case; had formed and expressed an opinion; it was fixed so far as he knew anything of the case. Then a question was propounded and answered as follows:

"Q. I ask your close attention to this question. If you were accepted and sworn as a juror in this case, could you and would you disregard entirely all what you have read and heard and base your opinion solely on the evidence put before you?

"A. I would do that and would not be influenced by what I had heard."

He further stated that he had no prejudice against accused. To counsel for the defense: He was in the saw mill business; had discussed the case with people, some of whom had heard the evidence; did not know if he had discussed it with any witness; he still had a strong opinion; if selected as a juror, would require strong evidence to remove it, and he was then asked:

"Q. Then at this time you could not go into the jury box and try this case as though you had heard nothing about it?

His answer was:

"A. I should not be influenced by what I had heard."

The juror further stated that he had heard the case discussed on the day he was being examined, two of the persons also being jurors, whose opinions were the same as his own; and he again stated that it would require strong evidence to remove his opinion. It is noted that in this instance, as well as all others appearing in the record, counsel for accused, in interrogating veniremen, propounded this same character of questions, never once inquiring as did the state as to the extent the juror would be influenced by his opinion in deciding the the case, and which, of course, was the all-important point affecting his qualification. At the same time, we do not mean to say that the mere statement that he would not be so influenced would be conclusive of his competency, if his examination otherwise con-

vinced the court that he was not sincere, or could not reasonably be expected to do as he had said. However, there is nothing in the present instance that convinces us of the want of sincerity, or that the judge who saw and doubtless knew the juror erred in holding him competent. If such an examination alone could disqualify, there would be few cases where laymen, inexperienced in the requirements of the law, no matter how honest and impartial, could not be eliminated.

### Bill No. 13.

G. Q. McDaniels swore that, although he had read of the case in the newspapers, and had an opinion, he had not attended the former trial, and could and would entirely disregard his opinion, and decide the case fairly and impartially upon the evidence. To the defense, he said he had talked to some persons who had attended the former trial; and after propounding questions as to whether it would take evidence to remove his opinion, was asked:

"Q. But if the witnesses did not remove that opinion, then you would base your verdict on the opinion you now hold?

"A. I suppose I would."

The court then propounded the following questions:

"Q. Did you understand the importance of the last question?

"A. No, I did not.

"Q. You have been asked if you would render a verdict on the opinion you now have. Would you do that?

"A. I don't know that I would.

"Q. Don't you know it requires evidence before you could convict the accused beyond a reasonable doubt, and that that evidence must be produced before you at the trial of the case? What would you do, Mr. McDaniels, if no evidence was produced before you beyond a reasonable doubt?

"A. I would have to give the doubt to the accused.

"Q. The test is this, Mr. McDaniels, is your mind in such a condition that you could go into that jury box and try this case upon the law and the evidence as you heard it at this trial and not be influenced by the opinion you hold? Could you do that?

"A. I could.

"Q. Do you feel that you could entirely disregard that opinion?

"A. Yes.

"Q. You are sure of that?

"A. I am."

Counsel again interrogated him as to the necessity of evidence to remove his opinion, and he answered as before.

Taking the examination as a whole, we find no error in overruling the challenge for cause.

### Bill No. 14.

Stoney Campbell stated he had read and heard about the case, and had formed an opinion; that it would yield to the evidence and he would not be influenced thereby in making up his verdict. To the defense he answered: That he lived at Ponchatoula; he was summoned before as a juror and excused; he had discussed the case with one of two witnesses; had an opinion which would require evidence to remove; that he would not take hearsay evidence, but the evidence he "heard from the stand"; he would disregard his opinion; he knew deceased intimately, but was not related to him.

The examination as a whole showed the juror qualified.

### Bill No. 15.

[12] Freiler Carter was summoned as a juror on the former trial and excused; had an opinion, but could and would entirely disregard it, and would give accused the same fair and impartial trial as one of his own nationality. In reply to the defense: Had discussed the case, heard and read of it, and had an opinion; that it would require strong evidence to remove the opinion; did not know deceased intimately, and knows none of his relatives. The juror was then examined by the court as follows:

"Q. You are the only man in the world who can answer this question: Do you feel that your mind is in such a condition that you could go into the jury box and entirely disregard any opinion which you may have, and try this case solely on the law and the evidence as you heard it at the trial of this case?

"A. I could do that.

"Q. You are sure of that?

"A. Yes, sir.

"Q. You would not be influenced by the opinion you have already formed?

"A. No, I naturally have that opinion.

"Q. Would that opinion influence you in making up your verdict?

"A. I don't think it would.

"Q. Are you sure it would not influence you in any way?

The answer in type was written, "No, sir," but it has been changed with a pen to read, "Yes, sir," and we were informed in argument and brief by counsel for defendants, and it is not denied by the state, that the change was made by the lower judge because he said the stenographer had caught the answer wrong; the judge recollecting that it had been, "Yes," instead of, "No."

Counsel for the accused then propounded questions and received answers of the juror, as follows:

"Q. What would become of your opinion when you went into the jury box?

"A. I would still have it.

"Q. Would you listen to that evidence more readily which did not agree with your opinion?

"A. I don't know that I would do that; I would weigh it all.

"Q. Would you weigh it all, or would you try to do it?

"A. I would do the best I could."

We think it makes little difference whether the answer to the question, "Are you sure it would not influence you in any way," be treated as, "No, sir," or, "Yes, sir," for the question involves both a positive and negative, the positive, "Are you sure," and the negative, "it would not influence you." If he had in mind the first, his answer would be, "Yes"; if the latter, it would be, "No," if he intended to answer in harmony with his preceding replies, which we think he did, taking the examination as a whole.

We do not find the juror to have been disqualified.

The remaining bills of exception taken to the rulings upon challenges to jurors for cause, numbered from 16 to 36, both inclusive, which, as heretofore stated, were not specifically discussed by counsel for appellants, we find present similar questions to those involved in the bills mentioned above. A careful examination convinces us that they disclose no error. See State v. Mayfield, 104 La. 173, 28 South. 997; State v. Herbert, 104 La. 227, 28 South. 898; La. Dig. vol. 4, pp. 492, 493, 494, 495; Verbo, Juries, §§ 56, 57, 58.

### Bill No. 37.

[13] Bill No. 37 was reserved to the refusal of the court to give a certain special charge with respect to "statements, admissions and confessions" testified to by one Jacob Uhle, a detective connected with the police force of the city of New Orleans, and made by the defendant Joseph Giglio. The charge requested was:

"The court charges the jury that the testimony of this witness touching alleged statements made (by) Giglio to witness is not offered to prove that Giglio's statement was true or as substantive evidence either against Giglio or the other defendants, but merely to show that the statement was made."

Having refused the said charge, the court charged the jury as follows:

"Gentlemen, this evidence is offered by the state only as against Joseph Giglio and is not to be considered by you as evidence, substantive or otherwise, as against any one of the other defendants. You are entitled to give it such weight as you deem proper as against Giglio."

Nothing erroneous has been pointed out as to this ruling, and our investigation has disclosed none; hence we hold the action of the judge correct.

## Bill No. 38.

The same charge was requested and refused by the court with reference to the testimony of Fred Scott, involving the statements, admissions, and confessions of Natale Deamore; and the court, instead, gave the identical charge as in the preceding instance, except that the name of Deamore was used.

The ruling was correct.

## Bill No. 39.

This bill presents the same issue and ruling as bills Nos. 37 and 38, but with respect to the testimony of James Murray, concerning statements by Deamore. There was no error.

## Bill No. 40.

The defense objected to the witness Lem H. Bowden (sheriff) testifying with respect to certain statements, admissions, and confessions purporting to have been made by Natale Deamore, until it had been shown that they were voluntary. The jury was then retired, and the testimony of Deamore, Bowden, Chas. Pulliam, Robert Thompson, Lem Hoggart, and Robert Wilson was heard by the court to determine the circumstances under which the statements had been made.

The facts and circumstances surrounding Deamore and the statements made by him are substantially the same in the present record as on the former appeal; and what we had to say then, as reported in the case of State v. Rini, 151 La. 163, 168–171, 91 South. 664, beginning with the last paragraph on page 665, down to the first paragraph commencing on page 667, covers the matter fully, without the necessity of repeating it here. We conclude now, as we did then, that the statements of Deamore were voluntary, and that there was no error in overruling the objections covered by this bill of exceptions.

## Bills Nos. 41 and 42.

Bills 41 and 42 cover the same issues as were raised in bill No. 40, except that they involved the testimony of Robert Thompson and Charles Pulliam with respect to the statements of Deamore on the same occasion, and for the reasons given above we are of the opinion that the court was correct in overruling the objections.

## Bill No. 43.

This bill was reserved to the overruling of objections to the testimony of Thomas V. Craven, assistant district attorney of the parish of Orleans, in regard to the statements of Deamore made in the city of New Orleans, upon the ground that they were not free and voluntary. The facts and circumstances involving the subject-matter of this bill are also substantially the same as those which we detailed on the former appeal, beginning with the first paragraph on page 667 of 91 South. down to and including the second paragraph on page 668 (151 La. 171–174). The evidence was received only as against Deamore, and for the reasons expressed there we find no error in the ruling of the lower court.

## Bill No. 44.

Bill No. 44 was taken to the refusal of the court to give a special charge of the same tenor as that requested in the case of bill No. 37, but covering the testimony in the present instance of the said Thomas V. Craven as to the statements of Deamore. The court thereupon gave the same charge, as to its effect against Deamore alone, and that the evidence should not be considered at all as against the other accused.

The ruling was correct. See authorities cited on the former appeal.

## Bill Not Numbered.

[14] This bill was reserved to the ruling permitting the sheriff, L. H. Bowden, to testify concerning certain statements made by Peter and Joseph Leotta in the presence of Joseph Bocchio, one of the accused, while under arrest in the Charity Hospital in the city of New Orleans.

The jury was first taken out and the said Bowden proceeded to detail what had taken place, being examined by counsel for the state and defense, and the substance of his testimony was as follows:

The witness came to this city, and with the district attorney of Tangipahoa parish, M. J. Allen, a newspaper reporter by the name of Wing, Peter Leotta, and Joe Leotta, went to the hospital where Bocchio was in bed under arrest. He further stated that they all went to Bocchio's room, but that the two Leottas were left outside the door, the other three going inside; that he first took little Joe Leotta into the room, in the presence of Bocchio, and asked him if he had ever seen "that man before," and the boy replied that he had; that Joe Leotta then stated, in reply to questions by Bowden in Bocchio's presence and hearing, that he had seen the latter at Giamalva's house; that he was there with a party of men; that Bocchio was in the car sitting on the front seat driving when the automobile came back from Independence or from some point that Saturday night, when he (Leotta) got in the car, and that he was positive of it. The sheriff then took the boy out and brought in his father, Peter Leotta, who, in response to questions, said that he had seen Bocchio before; that he was in the party that came to his (Leotta's) house; that he remained there until he left in the car with the others about 10 o'clock that night; that they all, including Bocchio, came back in the car that night; that they called to him (Leotta); and that he got in the car and was in it when the shots were fired at them and caused the car to stop on the road toward Albany. The witness further testified that he then took Peter Leotta out of the room; that he (Bowden) came back immediately and "asked Bocchio if he had anything to say about was he in the car"; that Bocchio said yes, he was, and that he got in the car in New Orleans; that Bocchio also said that no prior arrangements were made with him, but that the boys (meaning the other accused) came along and said, "Come on in, Joe, go with us," and that he went; that he drove the car all the way to Giamalva's house; that they stayed at Giamalva's home Saturday, and started away for Independence that night; that they drove a piece and turned around; that he did not know where the barn was, or who got out and went behind it; that he never saw any one go behind the brick building; that he got out and fixed something about the engine; that if any men came back running and got in the car, he did not see them; that five men came with him in the car from New Orleans, and when Leotta got in it made seven.

The witness further stated that the questioning of the Leottas in Bocchio's presence, the taking of them out, and the interrogating of him, all transpired in quick succession, and in the presence of Allen and Wing.

The jury was then brought back and the testimony repeated as above in their presence, and the court charged the jury, at the request of counsel for the state, that—

"When a person is under arrest, under a criminal charge, and statements incriminating him are made in his presence, or made to him, he is not bound to reply, and his failure to reply to such incriminating statements is not to be weighed or considered as evidence against him."

And before the witness testified in the presence of the jury, it was also instructed, at the request of the state, as follows:

"Gentlemen, this evidence is offered by the state only as against Joseph Bocchio, and is not to be considered by you as evidence, substantive or otherwise, as against any other of the defendants. You are entitled to give it such weight as you deem proper as against Joseph Bocchio."

It is thus demonstrated that, before the evidence of Bowden was allowed to go to the jury, the court had ascertained out of its presence the entire circumstances surrounding the matter, and that the state proposed to introduce it all for the purpose of showing the conditions under which the admission or confession was made. While the mere statements of the two Leottas in his presence, he remaining silent and under arrest, would, standing alone, be inadmissible under the jurisprudence (Marr's Crim. Juris. 662), yet where, as in this case, the accused, immediately following the conclusion of these statements and the exclusion of those persons from his room, without any inducement or coercion, but solely in reply to questions propounded by the officer, not only corroborates in every detail their said statements, but even incriminates himself further than they had, we think the whole circumstances are admissible, and the injury, if any, which might have been done without the confession, was entirely obliterated. Com. v. Trefethen, 157 Mass. 180, 198, 31 N. E. 961, 24 L. R. A. 235; Kingsbury v. People, 44 Colo. 403, 99 Pac. 61. See, also, State v. Birbiglia, 149 La. (on rehearing) 38, 39, and 40, 88 South. 533; Com. v. Brown, 121 Mass. 69. In fact, we think what happened in the present case may be treated as one continuous transaction or interview.

Each case must depend upon its own circumstances. If the accused was free to answer though under arrest, and the nature of the accusation was such as to call for a reply, and he does in the course of the interview acknowledge its correctness, the whole circumstances are admissible, notwithstanding he may have in the beginning remained silent. See O'Hearn v. State, 79 Neb. 513, 113 N. W. 130, 25 L. R. A. (N. S.) 542, and extended note.

## Motion for New Trial.

[15] A motion for a new trial was filed setting up the same matters as were covered by the bills heretofore discussed, together with others which are not cognizable by us, such as that the verdict was contrary to the law and the evidence, etc. Later, an amended or supplemental motion was filed, based upon newspaper accounts of what had happened on the day the verdict was rendered in connection with the removal of the prisoners to New Orleans. As heretofore stated, the only bearing the allegations of this amended motion could have on this appeal would be the extent to which they tended to support the contention that a change of venue should have been granted, and which has already had our attention.

A second amended motion for a new trial was filed, alleging newly discovered evidence to the effect that one or more of the jurors had been coerced into agreeing to the verdict, and another having made a bet as to the result of the trial before it took place. Both grounds, although the first was supported by the affidavit of the juror, and the second by an outsider, were thoroughly repudiated by the first and disproved as to the latter, and have not been pressed upon us for consideration.

We find nothing in any of the motions justifying our disturbance of the verdict.

The conviction and sentence are therefore affirmed.

O'NIELL, J., is of the opinion that the defendants should have been granted a change of venue; and is of the opinion that the confessions referred to in bills 40 to 43, inclusive, were not voluntary, and that the

statements of Peter and Joseph Leotta, referred to in the bill not numbered, were not admissible.