HAMITER, Justice.
In a 'bill of information, filed May 14, 1952 and which negatived prescription, an assistant district attorney for the Parish of Orleans charged that Mrs. Mabel Gray-son, between May 3, 1949 and April 14, 1952, committed a theft of $26,000 in United States currency belonging to Lakeview Theaters, Inc., of the City of New Orleans.
On being tried by a jury of five the accused was found guilty of “theft of a sum of money in excess of $100.00.” Thereafter, the judge sentenced her to imprisonment in the parish prison for one year, and she appealed from the conviction and sentence. Eight perfected bills of exceptions, reserved during the course of the trial, are contained in the transcript of appeal.
The contention of the State is that the accused and a co-worker, who were employed as ticket seller (or cashier) and ticket taker (or doorman), respectively, at the Lakeview Theater in New Orleans, operated together for a period of some two and one-half years in the commission of the offense charged. It asserts that from time to time the ticket taker pocketed whole adult tickets, instead of making the required and customary disposition thereof, and later returned them to the accused for resale and a division of the proceeds between the two.
At the trial that took place in December, 1952, one of the witnesses offered by the State in proof of its assertion was Mrs. Mary E. Shelton, a field auditor of Loews, Inc., the distributor for MGM films. As such representative she makes periodical or occasional attendance audits of the various theaters using MGM films, the purpose being to assure the distributor of proper remuneration which is based on a certain percentage of the proceeds received from tickets sold. While performing her duties notes are kept; and they, along with a written report, are sent to her employer at the conclusion of the audit.
On Sunday afternoon, April 6, 1952, Mrs. Shelton, according to her testimony, wetif *147 to the Lakeview Theater in the City of New Orleans to make an audit, she appearing there a few minutes before the box office opened at 1:15 o’clock. From the cashier then on duty (not the accused) she obtained the serial numbers of the first adult and child tickets to be sold (all tickets are numbered serially and consecutively), and thereafter she proceeded to conduct a checking or counting of the patrons as they entered, using for this purpose two counting clocks — one for adults and the other for children. About forty-five minutes after commencing she took a “reading”, this being a comparison of the numbers on her clocks with those on tickets then being handed to the doorman; and she found it in order or satisfactory. The checking continued, and similar favorable readings were taken at intervals of from forty-five minutes to an hour, until 5:00 o’clock when she left the theater and went to a nearby restaurant for dinner.
On returning at 6:00 o’clock Mrs. Shelton received from the accused herein (who had 'come on duty during her absence) the current ticket serial numbers and resumed the counting. Forty-five minutes later (6:45 o’clock) she took a reading and noticed a discrepancy. She testified that she then found a difference of “plus 49 adults” existing between her clock figure and the serial number on the last adult ticket received by the doorman, this meaning that “there had been 49 more admissions than there were tickets .recorded as being sold.” The counting continued, and at 7:40 o’clock she made another and her last tabulation. When asked by the district attorney what it showed, she stated: “I don’t remember. It seems that there was a plus 79. It had increased, anyway. You see, it had almost doubled.”
Shortly after that answer was given the district attorney showed the witness a copy of a written report (she purportedly made it on April 8, 1952), and he asked her to refer to it and inform the jury as to the final result of her checking on April 6, 1952. She replied that she “finished the day with a plus 77 Sunday evening.” Thereafter, in connection with the witness’ testimony, such report (marked S-3) was offered in evidence by the State. Whereupon, defense counsel announced: “To which offer we object on the grounds the best evidence is the lady’s testimony. She was only shown that for the purpose of refreshing her memory. She has refreshed her memory and testified. The report is only secondary evidence in the case.” . The objection was overruled; the report marked S-3 was admitted; and to the court’s ruling, bill of exceptions No. 1 was reserved by defense counsel.
In the law of evidence, applicable to both civil and criminal cases, are two established general principles of testimonial recollection respecting the use by a witness of writings prepared by him, at or near the time of and relating to the occurrence about which he is asked to testify, one being *149 known as “past recollection recorded” and the other called “present recollection revived.” Wigmore on Evidence, Third Edition, Volume III, Sections 734 et seq.; 58 American Jurisprudence, verbo Witnesses, Sections 579 et seq.; 125 A.L.R. Annotation, page 19; State v. Menard, 110 La. 1098, 35 So. 360; State v. Smith, 144 La. 801, 81 So. 320; Builliard v. New Orleans Terminal Co., 185 La. 924, 171 So. 78.
As shown by most of those authorities the first' principle pertains to a situation where the past occurrence is recorded in the writing and the witness, after reference thereto, has no independent recollection of and cannot recall the relevant facts and circumstances, although he is able to and does testify that he once knew and correctly recorded them. In that case the writing, verified and adopted as a record of past recollection, becomes a present evidentiary statement of the witness which is admissible in evidence and may be handed or shown to the jury by the party offering it.
“Present recollection revived”, on the other hand, is where the writing refreshes or revives the memory respecting the past occurrence and the witness can and does, after consulting it, testify to the pertinent facts and circumstances from an independent recollection. In that case the testimony of the witness, not the writing, constitutes the evidence. On this point the following observation, contained in Wigmore on Evidence (cited supra), Section 763, is appropriate :
“Writing used to Revive Recollection is1 not part of Testimony; yet the Jury may see it, to determine the Propriety of its Use. It follows from the nature of the purpose for which the paper is used (ante, Sec. 758) that it is in no strict sense testimony. In this respect it differs from a record of past recollection, which is adopted by the witness as the embodiment of his testimony and, as thus adopted, becomes his present evidence and is presentable to the jury (ante, Sec. 754). Nevertheless, though the witness’ party may not present it as evidence, the same reason of precaution which allows the opponent to examine it (ante, Sec. 762) allows the opponent to call the jury’s attention to its features, and also allows the jurymen, if they please, to examine it for the same end. In short, the opponent, but not the offering party, has a right to have the jury see it * * *,
“That the offering party has not the right to treat it as evidence, by reading it or showing it or handing it to the jury, is well established. That the opponent may do this, or that the jury may of its own motion demand it, is equally conceded.”
Recognizing the two general principles of evidence above discussed the State takes the position that Mrs. Shelton, the witness, used her report when testifying as “past recollection recorded” and it, therefore, was correctly admitted in evidence. To quote from a supplemental brief, the district attorney states: “The State maintains that the contemporaneous report made *151 by the witness was admissible because it was past recollection recorded in routine check by the witness. * * * It was not a case or situation where the witness was reviving her present recollection * The position is not well founded.
Prior to her being shown such report (S-3) the witness had testified at length from memory regarding her activities at the Lakeview Theater the afternoon and evening of April 6, 1952 (approximately nine months before the trial), she relating in great detail the circumstances surrounding her counting the patrons as they entered, including particularly where she stood at different intervals and the specific time of each of her two readings which disclosed claimed irregularities. For example, she remembered that she made a tabulation at 6:45 o’clock, which revealed “plus 49 adults”, and another about 7:40 o’clock.- As to the latter, it is true, she was not certain of the exact “over plus” shown; it seemed to her that there was a “plus 79”. But she recalled definitely that it had increased — almost doubled — since the 6:45 o’clock reading.
It was only because of her inability to recite the exact “over plus” noted at the 7:40 reading (she remembered the approximate “over plus”) that the report S-3 was shown to her. And on viewing it, along with another report prepared by the accused herein and previously introduced in evidence without objection as S — 1, she was able to testify that she finished the day with a “plus 77.” Incidentally, to ascertain that exact figure it was necessary for the witness to consider both reports together. S-3, insofar as pertinent here, revealed merely the total number of paid admissions as tabulated by Mrs. Shelton, or 1571; whereas, in S-l the accused had reported the total number of tickets sold as being 1494. By subtracting the latter figure from the former, the witness arrived at the difference of 77.
As a reason for admitting S-3 in evidence over defendant’s objection, the trial judge (in his per curiam) states: “The witness whose day to day occupation was a matter of observing and recording serial numbers of tickets at various movie houses in this area and in other areas, could not possibly remember the serial numbers of tickets sold at a particular time at a particular movie house, and was, of course, forced to refresh her memory from her official and original report, made by her, in her own handwriting, and made at the time and on the spot.
******
“It seemed to the trial court that the best evidence rule applied to the official report of the witness rather than to the memory of the witness for such details as serial numbers which were then running in the two hundred thousands.” But the fact is that S-3 listed no serial numbers whatever. Hence, it could not possibly lend assistance to the witness in testifying as to any particular serial number or num *153 hers. It was shown to her, as before pointed out, merely for the purpose of refreshing her memory as to the exact “over plus”, she having remembered only the approximate excess.
We conclude that the document S-3, which aided in reviving the present recollection of the witness, was not legal evidence under the circumstances and should not have been presented to the jury in the State’s behalf. We further conclude that its admission prejudiced the substantial rights of the accused and, thereby, reversible error was committed. Undoubtedly, the written report of the witness, when ■considered by the jury along with the other document admitted in evidence (S — 1), served to emphasize and substantiate her obviously damaging testimony (the credibility of which the jury might otherwise have discounted) to the effect that she ■counted 77 persons attending the Lakeview Theater on April 6, 1952 who did not possess legitimate tickets.
The remaining bills of exceptions, reserved by defendant, need not be considered in view of our announced conclusions. They relate to rulings on objections urged to specific questions which very likely will not be propounded on a new trial.
For the reasons assigned the conviction and sentence appealed from are annulled and set aside and the defendant is granted a new trial.