particular instrument on which his claim is based.

For the reasons assigned, the judgment of the District Court maintaining exceptions of no cause and no right of action to the petitions of intervention filed by E. O. Cresap, Sr., Helmut Sales, Inc. and Claude E. Meyer, and J. D. Tillman, III, is reversed and set aside, the exceptions are overruled and the case is remanded to the Trial Court for further proceedings in accordance with law and consistent with the views herein expressed; costs in this Court to be borne by plaintiff, Dudley T. Odom.

HAWTHORNE, J., does not participate.

132 So.2d 819

STATE of Louisiana

v.

Ora Lee ROGERS.

No. 45370.

June 29, 1961.

Rehearing Denied Oct. 4, 1961.

---◆---

G. Wray Gill, Gerard H. Schreiber, New Orleans, for appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., L. O. Fusilier, Dist. Atty., Ville Platte, Paul C. Tate, Asst. Dist. Atty., Mamou, for appellee.

HAMLIN, Justice.

This is an appeal by Ora Lee Rogers from his conviction and sentence to death for the murder of Selma Vizinat, Wife of Lumney Guillory, on May 1, 1959.

Twenty-four bills of exceptions were reserved during the course of trial; all except four are presented for our consideration.

The facts of the instant crime are to the effect that the victim, Mrs. Guillory, and her husband operated a grocery store in Reddell, Evangeline Parish, Louisiana, and in addition to being a retail merchant Mr. Guillory drove a school bus. On the morning of May 1, 1959, at approximately 7:15 a. m., Mr. Guillory left home to transport his riders to school, and at about 8:00 a. m. the murdered body of Mrs. Guillory was discovered in the grocery store; there were no eyewitnesses to the crime. Around noon of the same day, the defendant was apprehended between Palmetto and Melville, Louisiana, and was taken to the courthouse in Alexandria, Louisiana, where he confessed to the instant crime; he was incarcerated in the Rapides Parish Jail, Alexandria, Louisiana, almost all of the time until the time of trial.

Bill of Exceptions No. 1 was reserved to the trial court's denial of defendant's application for change of venue. In his motion for such change, the defendant alleged:

"Your mover avers that he has good reason to believe, and, so believing, alleges, that by reason of prejudice existing in the public mind against him, growing out of articles and items of news published in the general press in the Town of Ville Platte and Parish of Evangeline, the citizens of the Town have become so inflamed and prejudiced against your defendant that it will be impossible for your defendant to secure a fair and impartial trial as is guaranteed him by the Constitution and laws of the State of Louisiana and of the United States of America.

"That your mover makes this application as soon as he has discovered the fact that it will be impossible for your defendant to secure a fair and impartial trial in the Parish of Evangeline, and that this application is made, not for the

purpose of delaying the trial of your defendant, but for the purpose of securing an impartial trial, as has been made evident by virtue of the fact that mover has been removed from the Parish Jail in this Parish and kept incarcerated in the Parish Jail in Rapides Parish for safe keeping, in order to prevent his being illegally molested during the pendency of these proceedings."

Issues of the "Gazette," a weekly newspaper circulated in Reddell, Louisiana, were introduced and filed in evidence by the defense. The issue of May 7, 1959, (D-1), sets out on its first page a picture of the victim with the caption:

"The brutal Friday morning slaying of Mrs. Lumney Guillory, prominent and highly regarded Reddell housewife, shocked the nation and saddened those who knew her family. Funeral services for Mrs. Guillory, the 35 year old former Selma Vizinat of Mamou, were conducted in that community on Saturday morning."

The same issue also carries a picture of the accused accompanied by a deputy sheriff. It is captioned:

"This huge and powerful Ville Platte negro, 23 year old Ora Lee Rogers, photographed here with Evangeline's Chief Deputy Eraste Vidrine, last Friday morning shocked the nation with his brutal murder of Mrs. Lumney Guillory at her store in Reddell. No stranger to the police, Rogers had several times been arrested for molesting women and once convicted of burglary in Allen Parish. He was immediately suspected, tracked down and finally caught by state police near Melville. His indictment for murder by a grand jury is regarded a certainty, and the crime to which he has admitted carries the death penalty."

The news story relating the homicide is captioned, "Brutal Murder at Reddell Friday is Shock for Nation," and the first paragraph reads:

"The colorful pages of Louisiana's history have often been darkened by crimes of violence, but few can compare in brutality and terror with the shocking slaying of Mrs. Lumney Guillory, 35 year old white woman, who was murdered and ravished Friday morning by a gigantic negro man. Once the deed was done Ora Lee Rogers, 23 year old Ville Platte negro, left the Guillory store building at Reddell with $800 he took from the safe."

Other editions of the "Gazette" contain accounts of events following defendant's arrest, and they relate the proceedings preceding trial.

Mr. Jules Ashlock, Editor of the "Gazette," testified at the hearing of the mo-

tion for a change of venue that his weekly newspaper had a circulation of about 2,500 and that the bulk of the circulation was within the Parish of Evangeline. He stated that he had discussed the case with officials of the parish, and that the material in the news stories came mostly from official sources. He said that he had lifted an interview with Dr. Savoy from another newspaper and reproduced it. Mr. Ashlock was of the opinion that the defendant was despised in the parish, but he believed that the defendant would get a fair and impartial trial from the people of the parish. He affirmed that he did not know the opinion of the people in the parish with regard to the Ora Lee Rogers case or any other pertinent question at the time.

Frank C. Fontenot, Sheriff for the Parish of Evangeline, testified that under the circumstances he felt that the defendant could get a fair and impartial trial in the Thirteenth Judicial District. He stated that his prison was not federally and state approved as a house of detention—being an old jail out of style—and admitted that several persons had escaped therefrom; that he was accustomed to taking prisoners to Alexandria, because it was his understanding that the Rapides Parish Prison was approved. The sheriff said that he knew of no rumors of demonstration against the defendant; that he put the defendant in the Rapides Jail, because he did not want him to escape. When questioned as to whether he feared mob violence as against the defendant, the sheriff testified:

"Well, you're never sure of anything but we are pretty sure of our people. I wasn't afeared of that at all. I put him out there because, if you want to know, because it's less trouble for me, less risk, and he's out there and taken care by this government and we pay the bill."

Dr. Frank Savoy, Sr., Coroner for the Parish of Evangeline, testified that he investigated the death of the victim, being the first officer to get there, and that there was no mob hysteria. The coroner admitted that he had told a reporter that the instant crime was one of the most brutal murders he had ever investigated; he said, "And I told him this, I said we have—the kind of people we have in this country, I said, we're not supposed to have that kind of murder around here. We had some imported citizens that were not raised around here and we could expect that. We're not supposed to have that kind of murder happen among people that are reared around here." Dr. Savoy was questioned as to whether he had said any thing to any newspaper reporter or to any other person about a lynching mob, to which he replied, "No, I said nothing about a lynching mob, but I said this, the way we felt about it, if there was to be one, I'd like to be in it myself." He said that he did not know how other people in the

parish felt because he did not consult them. He said that he had told a reporter that if a necktie party were organized, he would like to be in it. Dr. Savoy concluded his testimony by stating that responsible people who would be called on a petit jury could give the defendant a fair trial; that he had no doubt of this fact.

Mr. Elvin LaHaye, a resident of Evangeline Parish, answered the following question in the affirmative:

"Mr. LaHaye, the defendant in this case is entitled to a fair and impartial trial from a jury—petit jury. He is also not—Let me ask you, under the circumstances of this case, the nature of the case, the fact that the defendant is a Negro and that the lady that was killed was a white lady and the general nature of the crime itself, murder and possible rape, do you feel that a jury can sit fair and impartially and judge this case impassionately to render the defendant a fair and impartial trial?"

Mrs. Elvin Reed, a member of the staff of the "Gazette," said that she thought the defendant would get a fair and impartial trial.

Marshal Frank and Sidney Ortego, school teachers in the parish, both testified that they thought the defendant would be accorded a fair and impartial trial.

None of the above seven witnesses (Sheriff Frank C. Fontenot, Dr. Frank Savoy, Sr., Jules Ashlock, Elvin LaHaye, Mrs. Elvin Reed, Marshal Frank, and Sidney Ortego), called on behalf of the defendant at the trial of the application for a change of venue, testified that he or any other person was inflamed or prejudiced against the accused by reason of reading the accounts of the instant crime in the "Gazette."

"An accused, under the constitution and laws of this state, whether guilty or innocent, is guaranteed a fair and impartial trial and it is the duty of the judge presiding over his trial to uphold such right. * * *" State v. Frazier, 209 La. 373, 24 So.2d 620, 621; State v. Borde, 209 La. 905, 25 So.2d 736; LSA–Constitution of 1921, Article I, Sec. 9."

LSA–R.S. 15:293 provides:

"If, on the trial of any application for a change of venue, it shall be established, by legal and sufficient evidence, that a fair and impartial trial can not be had in the parish in which the crime shall be charged to have been committed and in which the case is pending, the judge shall order a change of venue to an adjoining parish of the same judicial district, or to a parish of an adjoining district, and, by preference, to that parish in which a district court shall next be held."

"* * * It is well settled that a motion for a change of venue is addres-

sed to the sound discretion of the trial judge and that his ruling thereon will not be disturbed unless abuse of discretion is shown. * * *" State v. Pearson, 224 La. 393, 69 So.2d 512, 514. See, State v. Sheffield, 232 La. 53, 93 So.2d 691; 354 U.S. 915, 77 S.Ct. 1303, 1 L.Ed.2d 1431; 354 U.S. 943, 77 S.Ct. 1405, 1 L.Ed.2d 1541; State v. Clarence Wilson, 240 La. 1087, 127 So.2d 158.

■ The burden of establishing, by legal evidence, that a defendant could not secure a fair and impartial trial in the parish where the indictment is laid rests with the applicant. State v. Faciane, 233 La. 1028, 99 So.2d 333. The test to be applied is: "Can there be secured with reasonable certainty from the body of such citizens, with the use of the safeguards of the law, a jury whose members will be able to try the case upon the law and evidence adduced on the trial, uninfluenced by what they may have heard of the matter, and who will give the accused the full benefit of any reasonable doubt which may arise from either the evidence or the lack of it?" State v. Rini et al., 153 La. 57, 95 So. 400, 404; State v. Faciane, supra; State v. Scott, 237 La. 71, 110 So.2d 530. "Applications for a change of venue are addressed to the sound discretion of the trial judge and unless an abuse of such discretion is shown his ruling will not be interfered with. * * *" State v. Roberson, 159 La. 562, 105 So. 621,

622; State v. Johnson, 226 La. 30, 74 So.2d 402; State v. Faciane, supra; State v. Scott, supra. See, State v. Wilson, 240 La. 1087, 127 So.2d 158.

■ In the instant prosecution, the proof does not reflect nor reveal that public opinion in Evangeline Parish was crystallized and fixed against the defendant. It does not disclose that social and economic exactions would knowingly or unknowingly influence any juror to bring in a particular verdict. The evidence of the witnesses presented on the trial of the motion for a change of venue is uncontradicted. The newspaper articles do not appear to be any different from news articles covering cases of a similar nature. See, State v. Rini, 153 La. 57, 67, 95 So. 400, 404. The first article reciting the commission of the crime appeared six days after its commission and at a time when the defendant had already confessed to committing the offense. The testimony of the Sheriff of Evangeline Parish is to the effect that the defendant was incarcerated in the jail of an adjoining parish to avoid escape and not to avoid mob violence.

We find no abuse of discretion by the trial judge. Bill of Exceptions No. 1 is, therefore, without merit.

Bill of Exceptions No. 2 was reserved to the trial court's ruling that the defendant was presently sane.

Counsel for the defendant argues in brief:

"Although almost every facility known to medical science was available to test the defendant's sanity, none of them were used.

"No objective tests at all were given to the defendant such as electro-encephalograms, Wasserman tests, spinal fluid tests, or blood tests.

"His family was not interviewed nor were his friends or associates. No inquiry was made into his mental or physical background. As a matter of fact, nothing was done except to talk to the defendant.

"This hardly seems a reliable basis for a conclusive opinion on the sanity of a man who is alleged to have committed an insane act.

"Of great significance is the fact that the defendant's military record reveals that he was substandard mentally. If the defendant is an epileptic subject to epileptic seizures during which time he is capable of any kind of behavior, to this day, this Court nor the Trial Court would have known anything about it.

"If the defendant were a schizophrenic and likewise capable of any kind of violent acts, to this day, neither this Court nor the Trial Court would know anything about it.

"It is a strange commentary on psychiatry that generally speaking almost every one who privately consults a psychiatrist is recommended to be treated, whereas, most defendants are found to be well oriented."

The record discloses that on August 18, 1959, counsel for the defendant filed a motion and application for a lunacy commission to inquire into the defendant's mental condition at the time of the commission of the offense charged and into his present mental condition. On the same day, the trial court issued two orders—one appointing Dr. Davidson Texada, Dr. Milton Freiman, and Dr. Frank Savoy, Sr. to examine defendant to determine his sanity as of the time of the commission of the alleged offense, May 1, 1959, and the other appointing the same doctors to examine defendant to determine whether or not he is insane or mentally defective to the extent that he is unable to understand the proceedings against him or to assist in his defense, or to determine whether said defendant knows the difference between right and wrong and is able to intelligently assist counsel in his defense and fully understand the nature and the consequences of the proceedings. The court set a hearing for August 21, 1959, to determine the defendant's present mental condition.

On August 19, 1959, the three doctors reported to the trial judge that after thor-

ough examination of Ora Lee Rogers it was their opinion that he was sane and not mentally defective.

On August 22, 1959, the hearing on the plea of present insanity was taken up by the trial court. The expert witnesses were examined;[1] in order to afford defendant every opportunity to make a showing, the trial court ordered the hearing continued to August 29, 1959.

The Minutes of the Trial Court recite that on August 29, 1959, the State moved to withdraw the report of the Lunacy Commission on present insanity, and counsel for the defense moved to withdraw their request for a plea of insanity at the time of the commission of the offense charged. An order issued appointing Dr. Davidson Texada, Dr. Milton Freiman, and Dr. Reed Fontenot to determine the defendant's present insanity.

On September 8, 1959, the Lunacy Commission reported to the trial judge that they, the undersigned, found that the defendant "is sane and not mentally defective, that the said defendant is able to understand the proceedings against him and to assist in his defense, and that said defendant knows the difference between right and wrong and is able to intelligently assist counsel in his defense and fully understand the nature and consequence of the proceedings."

At a sanity hearing held on September 14, 1959, Dr. Davidson Texada, a psychiatrist engaged in private practice, testified that he examined the defendant professionally on three occasions, namely, June 16, August 19, and August 29, 1959. He confirmed the report of September 8, 1959, to the effect that the defendant was presently sane. When asked to elaborate on the tests given the defendant—mental tests—he stated, "The psychiatric examination is not a test in a laboratory sense at all. It is an interview with the patient in determining his mental status, whether or not there is any delusional thinking, whether or not there is any disturbance in his consciousness, in his stream of thought, in his content of thought, and in his emotional state." Dr. Texada said that rather than a test, there was an interview with the patient at which an evaluation of the man's clarity of thinking— whether or not there is any delusional or unreal thinking in his mental makeup—was made. He said that the defendant was friendly and cooperative during the interview, talking rationally, coherently, and relevantly; he was completely satisfied that the defendant was sane at the time of the hearing and was of normal intelligence. Dr. Texada stated that he had spoken about the defendant with Deputy Sheriff Dallas Bertrand, who had been familiar with Ora Lee Rogers in the jail; with Mr. E. H. Malone, for whom the defendant had worked;

1. Their testimony was a confirmation of their report.

with Robert Rhines, the colored man who had picked up 'Ora Lee in his car on the day of the alleged crime; with the defendant's mother; with Evester Higgins, who had known the defendant for a period of two years and had worked with him; and with Lee Ardoin, who had picked him up on the date he was brought in.

Dr. M. S. Frieman, a specialist in psychiatry, testified that he examined the defendant on two occasions and was of the opinion that he was presently sane. Dr. Frieman corroborated the testimony of Dr. Texada, stating that no clinical tests were given the defendant because the members of the commission felt that none were necessary. Dr. Frieman stated that he believed that his examination of the defendant was adequate to determine whether or not the defendant was presently sane, and to make his report to the trial judge.

Dr. Reed A. Fontenot, a physician of twenty-three years' practice, testified that it was his professional opinion that the defendant was sane; he confirmed the report of September 8, 1959. He said that a man could be perfectly sane and have an abnorman encephalogram and a positive Wasserman test. He said that no clinical tests were given because the defendant's mental condition did not warrant them. Dr. Fontenot said that an electro-encephalogram was used to determine the cause of convulsive states more than anything else, and that a man is sane when he is in such a state although he might have lost consciousness.

Counsel for the defendant offered in his behalf Armed Services records to the effect that the defendant had attended school through the fifth grade and that he was found not acceptable for induction under UMT & S Act as Amended, being identified as: Sub-standard mentally (V–4). No other evidence was offered on behalf of the defendant.

"Under our law the judge is given the exclusive responsibility of ultimately determining the mental capacity of an accused under a plea of present insanity, subject to review only by this court, and the jurisprudence is to the effect that anyone asserting an abuse of that discretion has the burden of establishing it." State v. Faciane, 233 La. 1028, 99 So.2d 333, 341; State v. Wilson, 240 La. 1078, 127 So.2d 158, 166.

In the instant prosecution, the trial judge followed the procedure set forth in LSA–R.S. 15:267;[2] the defendant did

2. LSA–R.S. 15:267: "If before or during the trial the court has reasonable ground to believe that the defendant against whom an indictment has been found or information filed is insane or mentally defective to the extent that the defendant is unable to understand the proceedings against him or to assist in his defense, the court shall immediately fix a time for a hearing to determine the defendant's mental condition. The court may appoint two disinterested physicians to examine the defendant with regard to his present mental condition and to testify at the

not bear his burden of establishing to the satisfaction of the trial court that he was incapable of understanding the proceedings and the charge preferred against him and of assisting counsel in his defense.

"The law presumes that every man is sane. State v. Seminary, 165 La. 67, 115 So. 370, State v. Toon, 172 La. 631, 135 So. 7. And to warrant the sustaining of a plea of present insanity, thereby preventing trial of a criminal action, it must appear by a preponderance of evidence that the accused is so mentally deficient that he lacks capacity to understand the nature and object of the proceedings against him and to assist in the conducting of his defense in a rational manner. * * * That this accused is thus incapacitated is not made to appear by any of the evidence adduced— * * * Rather, there is a substantial disclosure to the contrary.

We are unable to conclude, consequently, that the judge erred in declaring him presently sane." State v. Riviere, 225 La. 114, 72 So.2d 316, 317.

"Under the law of this state every accused is presumed to be sane, and the burden is on him to establish by a clear preponderance of the evidence that he is so mentally deficient that he lacks capacity to understand the nature and object of the proceedings against him and to assist in conducting of his defense in a rational manner. State v. Bailey, 233 La. 40, 96 So.2d 34, 69 A.L.R.2d 340; State v. Riviere, 225 La. 114, 72 So.2d 316, and authorities there cited." State v. Eubanks, 240 La. 552, 124 So.2d 543, 552.

We are in full accord with the finding of the trial judge that the defendant was sane at the time of trial and that he did not overcome the presumption of sanity by a

---

hearing. Other evidence regarding the defendant's mental condition may be introduced at the hearing by either party.

"If the court, after the hearing, decides that the defendant is able to understand the proceedings and to assist in his defense, it shall proceed with the trial. If, however, it decides that the defendant, through insanity or mental deficiency is not able to understand the proceedings or to assist in his defense, it shall take proper steps to have the defendant committed to the proper institution. If thereafter the proper officer of such institution is of the opinion that the defendant is able to understand the proceedings and assist in his defense the officer shall report the fact to the court

which conducted the hearing. If the officer so reports, the court shall fix a time for a hearing to determine whether the defendant is able to understand the proceedings and to assist in his defense. This hearing shall be conducted in all respects like the original hearing to determine the defendant's mental condition. If after the hearing the court decides that the defendant is able to understand the proceedings against him and to assist in his defense it shall proceed with the trial. If, however, the court decides that the defendant is still not able to understand the proceedings against him or to assist in his defense, it shall recommit him to the proper institution."

preponderance of the evidence. Bill of Exceptions No. 2 is without merit.

■ Bills of Exceptions Nos. 3 and 4 are related and will be discussed jointly.

Bill of Exceptions No. 3 was reserved to the ruling of the trial court holding that the State's answer to a motion for a bill of particulars was sufficient.

Bill of Exceptions No. 4 was reserved to the trial court's ruling that the State did not have to elect under which section of LSA–R.S. 14:30 the present indictment was founded.

In a motion for a bill of particulars, counsel for the defendant requested that they be informed under which section of LSA–R.S. 14:30 the defendant was charged. The State answered that the defendant was charged under both Section (1) and Section (2) of the statute which recites:

"Murder is the killing of a human being,

"(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

"(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated arson, aggravated burglary, aggravated kidnapping, aggravated rape, armed robbery, or simple robbery, even though he has no intent to kill.

"Whoever commits the crime of murder shall be punished by death."

Counsel for the defendant then filed a supplemental motion for a bill of particulars, averring:

"* * * the State has answered defendant's motion for a bill of particulars by stating that your defendant is charged under both Sections 1 and 2 of Article 30 of the Louisiana Criminal Code without informing your defendant of what felony your defendant is charged with engaging in the perpetration or attempted perpetration of which there are six possible felonies specified in Section 2 of Article 30 of the Louisiana Criminal Code and that your defendant is not able to properly prepare his defense unless he is informed which of these six felonies he is alleged to have been engaged in the perpetration or attempted perpetration of."

The State answered that the defendant was charged under both Section (1) and Section (2) of Article 30 of the Louisiana Criminal Code, LSA–R.S. 14:30. It further answered that the defendant was charged as stated in Article 1 of the answer; and that under Section (2) of Article 30 of the Louisiana Criminal Code, he was charged with committing murder of Mrs. Selma Vizinat Guillory by causing her death while engaged in the perpetration of Armed Rob-

bery and Simple Robbery and aggravated Rape.

Defendant's counsel argue before us that they were placed at a disadvantage by having to base a defense on inconsistent charges prejudicial to the defendant—armed robbery and simple robbery were inconsistent with each other. They contend that the State's answer to the motion and supplemental motion for a bill of particulars was insufficient, and that the State should have been forced to elect under which section of LSA-R.S. 14:30 the indictment was founded.

In State v. Rowan, 233 La. 284, 96 So.2d 569, 571, we answered the issues herein raised, holding:

"Article 30 of the Louisiana Criminal Code describes two sets of circumstances under which the crime of murder can be committed, but it is obvious that this crime can be committed under any one of the two sets of circumstances, and also under a combination of the circumstances, set out in Subsections (1) and (2). The State's answer to the motion for a bill of particulars shows that the crime in the instant case is alleged to have been committed under circumstances set out in both subsections of the article. In short, murder can be committed under Subsection (1) or under Subsection (2) of the article or under both subsections at the same time, which is exactly what is alleged to have happened in the instant case. Consequently the judge erred in ordering the State to elect.

"The cases of State v. Prince, 216 La. 989, 45 So.2d 366, and State v. Jackson, 227 La. 642, 80 So.2d 105, are complete authority for the conclusion that in the instant case the State should not be forced to elect.

"Respondents say that if the answer of the State to their motion for a bill of particulars stating that they were being prosecuted for the crime of murder committed under both Subsection (1) and Subsection (2) of Article 30 be deemed sufficient and the State is not required to elect, then they cannot adequately prepare their defense to the charge since they are not sufficiently informed of the nature and cause of the accusation against them as guaranteed by Article 1, Section 10, of the Louisiana Constitution of 1921.

"It has been said by this court that 'The purpose of a bill of particulars is to afford an accused a reasonable amount of information in order that he may properly prepare his defense, and to limit the scope of proof and restrict the introduction of evidence.' State v. Dugan, 229 La. 668, 86 So.2d 528, 529, and authorities there cited.

"The bill of particulars in this case certainly affords respondents ample in-

formation to properly prepare their defense, and their complaint that it does not is without merit."

Bills of Exceptions Nos. 3 and 4 are without merit.

Bills of Exceptions Nos. 5 and 14 are related and will be discussed together.

Bill of Exceptions No. 5 was reserved to the trial court's overruling defendant's motion to sequester Lumney Guillory, the victim's husband, or to order him not to remain within the inner circle of the courtroom.

Bill of Exceptions No. 14 was reserved when the trial court overruled the defendant's objection to Lumney Guillory's testifying.

In his Per Curiam to Bill of Exceptions No. 5, the trial judge explains, as follows, the circumstances which gave rise to the reservation of the instant bills:

"Before the trial was begun, and before any jurors had been interrogated on their voir dire, the defendant requested a sequestration of the witnesses which was ordered.

"The defendant objected to Mr. Lumney Guillory, the husband of the deceased, occupying a chair at the desk of the prosecuting attorneys, and requested the court to order him sequestered and placed under the rule together with the other witnesses in the case.

"The court ordered the said Lumney Guillory away from the desk of the prosecuting attorneys, but permitted him to seat himself within the inner circle of the court room.

"The defendant further objected, and requested the court to order the said Lumney Guillory to remove himself from the inner circle of the trial room. This the court declined to do, and bill was reserved.

"The first witness called by the prosecution was the husband of the deceased, Mr. Lumney Guillory."

Mr. Guillory testified as to his occupations and as to the amount of money he had in his safe when he left his store on the morning of May 1, 1959; that no money was left when he returned and found out that his wife was dead.

In brief, counsel for the defendant argue:

"* * * that allowing Mr. Guillory to remain in the Courtroom and then testify was an abuse of the discretion of the Trial Judge in three respects:

"1) allowing him to remain in the Courtroom;

"2) allowing him to remain within the inner circle of the Courtroom;

"3) allowing him to testify when it was known that he had been exempted from the sequestration rule.

"* * * * * *

"The defense contends that the same law that gives the State the right

to try him for murder gives him the right to have the witnesses sequestered. And a denial of this right denies him due process of law guaranteed to him by the Constitution of our State as well as that of the United States."

LSA–R.S. 15:371 provides:

"The judge may, at any stage of the trial, order the sequestration of the witnesses. As soon as such order shall have been given it shall be the duty of the sheriff to take charge of the witnesses and to remove them to a place where they shall not be able to see or hear any of the proceedings taking place in court. Nor shall there be, while they shall be sequestered, any communication between them and others or between them and any witness who shall have testified. Any disregard of these provisions by a witness shall disqualify him from testifying and shall subject him to punishment for contempt; provided, that the judge may in all cases, in his discretion, permit any witness to testify; provided, further, that the issuance of such order shall not deprive either party of the right of calling or examining as a witness one who shall not have obeyed the order of sequestration, when such party shall show that the witness remained in court or otherwise disobeyed the order without the knowledge and without the connivance of the party calling him."

■ "We have consistently honored the rule that the ordering or refusing to order sequestration of witnesses is within the sound discretion of a trial court, and it is only when the exercise of such a discretion is arbitrary or unreasonable, to the prejudicial injury of the defendant, in obtaining a fair and impartial trial, that we would be warranted in setting aside a verdict. * * *" State v. Palmer, 227 La. 691, 80 So.2d 374, 381; State v. Scott, 237 La. 71, 110 So.2d 530; 361 U.S. 834, 80 S. Ct. 85, 4 L.Ed.2d 75; State v. Ferguson, 240 La. 593, 124 So.2d 558. We do not find that the trial judge abused his discretion in the instant prosecution or that his action in permitting Mr. Guillory to remain in the courtroom was arbitrary or unreasonable. Mr. Guillory was the first witness to testify, and his testimony contained only a statement of fact as to the contents of his safe. The obtaining of a fair and impartial trial was not influenced by the trial judge's exercise of his discretion, nor was the defendant prejudiced to the extent that the verdict should be set aside.[3]

"Bill of Exception No. 8 was taken to the refusal of the trial judge to

---

3. "No judgment shall be set aside, or a new trial granted by any appellate court of this state, in any criminal case, on the grounds of misdirection of the jury or the improper admission or rejection of evidence, or as to error of any matter of

sequester the witnesses at the commencement of the examination of the prospective jurors on their voir dire. The witnesses were sequestered before the prosecution began its opening statement and remained so throughout the trial. Under the provisions of LSA–R.S. 15:371, the judge may at any stage of the trial order the sequestration of the witnesses. The sequestration of witnesses is within the sound discretion of the court and this Court has on numerous occasions held that a verdict of a jury will not be set aside in the absence of any showing of an abuse of this discretion." State v. Lea, 228 La. 724, 84 So.2d 169, 172; certiorari denied, 350 U.S. 1007, 76 S.Ct. 655, 100 L.Ed. 869. See, State v. Kelly, 237 La. 991, 112 So.2d 687; State v. Pearson, 224 La. 393, 69 So.2d 512.

Bills of Exceptions Nos. 5 and 14 are without merit.

Bill of Exceptions No. 6 was reserved to the trial court's action in overruling defendant's motion to quash the Tales Jury

Panel because it did not contain 100 true men.[4]

The trial judge sets forth in his Per Curiam the facts leading up to the reservation of this bill as follows:

"The regular jury panel, having been exhausted, without the completion of the jury to try defendant's case, the court ordered the tales jury box opened and removed therefrom the 100 names therein, and ordered a typewritten list thereof furnished to the counsel for the state and the defendant. The Sheriff was ordered to summon the said 100 tales jurors to appear in court on the morning following.

"For the purpose of properly presenting its motion to quash for the court's determination, it was stipulated and agreed between counsel, as follows:

" 'It is stipulated by and between the State and the defense that Louis Martel, whose name appeared on the regular jury venire is the same person whose name appeared twice on the tales

---

pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right." LSA–R.S. 15:557.

4. "The judge may at any time order the drawing of additional jurors and designate the number to be drawn, for the trial of criminal cases at a regular, continuous or special session of court; provided, that said jurors shall be drawn pursuant to the formalities herein provided for the drawing of the regular venire, except that no publication of the list of jurors so drawn need be made." LSA–R.S. 15:185.

jury list. It is also stipulated that Jules P. Fuselier whose name appeared on the tales jury list is the same person as Jules Fuselier on the regular jury venire. It is further stipulated that Laten Guillory whose name appeared on the tales jury list is the brother of the husband of the victim.' "

The trial judge explains his refusal to quash the tales jury panel as follows:

"If I thought that there was any merit in your motion here, I wouldn't hesitate one minute to just call another hundred men. My Jury Commission is here this morning, but I don't think you have any merit here because I don't think that the drafters of the Code ever intended that highly technical motions should be permitted to throw a monkey wrench in that machine of justice unless the defense was prejudiced. You show no fault and no prejudice. The fact that this man, Laten Guillory happened to be on the jury, how do you know that the Jury Commission knew that this man was a brother-in-law of the victim, how do you know that. Perhaps, it didn't, but even then you're not prejudiced, you could challenge him for cause, as a matter of fact I think I have already excused him to be sure that you would not be prejudiced. The other two jurors who were duplicated, I told the sheriff yesterday not to notify them because there would not [be] sense in bringing these men here when you had already excused them and challenged them both so you are not prejudiced there, and thirdly, the most significant point, I think, is that it is within my discretion, I had that list here in my hands yesterday when I was drawing those men, and I saw those duplications and if I had thought anything of it or if I had wanted to do anything other than the right thing I could have just put them aside and summoned another five instead of a hundred but I insisted that the clerk in an openhanded way, I insisted the clerk put the names on the list nevertheless to show that everything was open and above board. I overrule your motion to quash."

Counsel for the defendant contend that the panel was not in conformity with LSA–R.S. 15:186,[5] and that the defendant is en-

5. LSA–R.S. 15:186—"It shall be the duty of the jury commission at such times as the court may order, to select one hundred tales jurors, good men and true, and place their names in a box known as the tales jury box, securely seal the same and deliver it to the district clerk of the parish, who shall keep the same so sealed and unopened in his possession until ordered by the court to produce the same. If on the trial of any criminal case, the regular venire is exhausted, or it appears that it will be exhausted, before the selection of a jury therein, the court at its discretion may instruct the clerk to open such tales

titled to the benefit of the law to the same extent as the State.

" * * * The law does not require, and it is not practicable, that the tales jury box shall always contain the complement of 100 names of men qualified for jury duty. * * *" State v. Desselles et al., 150 La. 494, 90 So. 773, 779. See, Act 113 of 1918.

 LSA–R.S. 15:203 provides that it shall not be sufficient cause to challenge a venire because of defects or irregularities in the manner of selecting the jury unless fraud has been practiced or some great wrong committed that would work irreparable injury. State v. Sauls, 226 La. 694, 77 So.2d 8; State v. Jenkins, 236 La. 256, 107 So.2d 632. Unless some fraud has been practiced, a venire cannot be set aside because some of the jurors on the list are not qualified to act or because of some defect or irregularity in the manner of selecting the jury. State v. Gros, 204 La. 705, 16 So.2d 238; State v. Rue, 236 La. 451, 107 So.2d 702.

 We do not find that the defendant was prejudiced by the trial court's refusal to quash the Tales Jury Panel because of a simple and unharmful error of the Jury Commission, nor do we find that any fraud was practiced or great wrong committed which worked irreparable injury to the defendant. Bill of Exceptions No. 6 is, therefore, without merit.

Bills of Exceptions Nos. 7, 8, 9, 10, 11, 12, and 15, were reserved to the trial court's refusal to sustain counsel's challenges for cause of the prospective jurors, Vories Morein, J. D. Hardegroder, Lawrence Ardoin, Abbey Fontenot, Eumere Guillory, Dudley Guillory, and Wilbert Ardoin.

Vories Morein, a farmer and oil bulk dealer engaged in business for himself, testified that he had known the victim by sight and knew Mr. Guillory fairly well, the acquaintance being one of twenty-five or thirty years; he was of the opinion that he could render a fair and just verdict, sitting as a fair and impartial juror. He said that he would not be affected by economic reper-

jury box and draw therefrom such number of tales jurors as in its judgment may be necessary to serve on said case, and it shall be the duty of the sheriffs to forthwith summon such tales jurors so summoned to report immediately for jury service in said court in said case; provided, that the names of tales jurors drawn from such tales jury box and who do not serve shall not be returned to said tales jury box by the district clerk, but the slips upon which the names are written shall be destroyed in the presence of

the court by the district clerk; and provided, that the jury commission may, at any time, without the order of the court, supplement the names of tales jurors in said tales jury box until the full complement of one hundred is reached. All tales jurors shall possess the same qualifications as provided for regular jurors, but no publication of the tales jury list shall be necessary, but a copy of the same as drawn by the clerk, shall be furnished to the state and to the defense before the trial shall proceed; * * *"

cussions if he had to make a determination of less than guilty. Mr. Morein said that he was a member of the nine member school board of which Mr. L. O. Fusilier, District Attorney prosecuting the instant case, was counsel, but that this membership would not influence his judgment. When questioned as to whether the fact that Mr. Guillory worked for the school board as a bus driver would affect his ability to arrive at a fair and impartial verdict, Mr. Morein replied negatively.

Counsel for the defendant challenged Mr. Morein for cause, contending that he was "tied up politically." The trial court ruled: "I rule that this man is qualified. I know this man and I don't think he would commit perjury." After further questioning, Mr. Morein was challenged peremptorily by counsel for the defendant.

J. D. Hardegroder testified that he had lived in Evangeline Parish all of his life; that he had not known the victim and did not know Mr. Guillory. He said that he was running for Police Juror for the Second Ward, but that he could render a fair and impartial verdict. He affirmed that influences that lose an election would not sway him.

Counsel for the defendant challenged Mr. Hardegroder for cause, averring that subconsciously he was going to be affected by the fact that he was a candidate for public office. The trial judge overruled the chal-

lenge; counsel for the defendant peremptorily challenged the juror.

Lawrence Ardoin testified that he worked for the Highway Department and was a neighbor of the deceased and her husband. He said that he traded at the Guillory Store a "little," going in the store about once a week. Mr. Ardoin stated that the facts that he knew friends of Mr. Guillory and the deceased and that the offense charged involved a white lady and a colored man would not prevent his rendering a fair and impartial verdict.

Counsel for the defendant argued that regardless of Mr. Ardoin's sincerity, they thought that his closeness to the Guillorys would influence his verdict. A challenge for cause was overruled, and a peremptory challenge was then exercised.

Abbey Fontenot, a retail merchant, testified that he and Mr. Guillory went to school together for ten or eleven years, although they were in different grades; he said that they were still friends even though they did not meet often. He affirmed the fact that even though Mr. Guillory was his friend and Mrs. Guillory was the victim, his ability to render a fair and impartial verdict would not be affected.

Because of the close association of Mr. Guillory and Mr. Fontenot, counsel for the defendant challenged Mr. Fontenot for cause. The trial judge overruled the chal-

lenge; a peremptory challenge was exercised by the defendant.

Eumere Guillory, a barber and no relation of the deceased and her husband, stated that he had known Mrs. Guillory since she was a child. He affirmed that even though there had been much talking in his barber shop at Mamou, Louisiana, he had formed no opinion of the case. He said that he could render a responsive verdict unafraid of social or economic consequences.

Counsel for the defendant challenged Eumere Guillory for cause, averring that they felt that he was honest and sincere, but that they knew what went on in barber shops and felt that an opinion prejudicial to the defense could not be avoided. The trial court overruled the challenge; counsel for the defendant exercised a peremptory challenge.

Dudley Guillory, a gasoline salesman living in Reddell, Louisiana, testified that he had known Mrs. Guillory for about ten years before her death and had known Mr. Guillory for about thirty-five years; that he went to the Guillory Store, but that he was not a frequent social visitor. Prospective juror Guillory affirmed that he was not a relation of either Mr. Guillory or Mrs. Guillory; that he went to the funeral home where Mrs. Guillory's body was exposed to pay respects but did not talk with Mr. Guillory. This prospective juror stated that he had formed no opinion about the case, had

not been impressed, and would have no feeling in the matter if selected to serve on the jury.

Counsel for the defendant challenged Dudley Guillory for cause, contending that his being on the petit jury would be a detrimental effect to the accused. The trial court overruled the challenge; a peremptory challenge was exercised.

Wilbert Ardoin, an employee of the Department of Agriculture for the State of Louisiana and a life-long resident of Evangeline Parish, testified that he had not known Mrs. Guillory too well, but that he knew Mr. Guillory "pretty good." He said that he had a conscience, and that the fact that he knew Mr. Guillory so well would not unintentionally affect his ability to serve as a fair and impartial juror. Ardoin stated, "I don't have prejudice for nobody."

Counsel for the defendant challenged Wilbert Ardoin for cause—knowing Mr. and Mrs. Guillory very closely. The trial judge overruled the challenge; a peremptory challenge was exercised.

LSA–R.S. 15:351 provides:

"The special causes for which a juror may be challenged are:

"(1) That he is not impartial, the cause of his bias being immaterial; but an opinion as to guilt or innocence of the accused, which is not fixed, or has not been deliberately formed, or that

would yield to evidence, or that could be changed, does not disqualify the juror;

"(2) That the relations, whether by blood, marriage, employment, friendship or enmity, between the juror and the accused, or between the juror and the person injured, are such that it must be reasonably believed that they would influence the juror in coming to a verdict;

"(3) That the juror served on the grand jury which found the indictment, or on a petit jury which once tried the defendant for the same offense, or on the coroner's jury that investigated the homicide charged against the accused."

LSA–R.S. 15:353 states:

"No defendant can complain of any ruling sustaining or refusing to sustain a challenge for cause, unless his peremptory challenges shall have been exhausted before the completion of the panel; moreover, the erroneous allowance of challenges for cause affords the defendant no ground of complaint, unless the effect of such ruling is the exercise by the prosecution of more peremptory challenges than it is entitled to by law, or unless the defendant by such ruling is forced to accept an obnoxious juror."

LSA–R.S. 15:354 provides:

"In all trials for any crime punishable with death, * * * each defendant shall be entitled to challenge peremptorily twelve jurors, * * *"

■■■■ "The purpose of allowing challenges for cause is to secure a fair and impartial trial and the right exists independent of any statutory provision since it is an incident of the trial by jury. The Legislature, in adopting those provisions of the Code of Criminal Procedure treating of that subject, merely codified the law in existence at the time of the adoption of the Code as a means of readily securing to the accused a fair and impartial trial by jury, as guaranteed by the Constitution. Hence the rule, universally obtaining, that the defendant has the right to have jurors examined as to their qualifications for the purpose of showing grounds for challenge for cause, and also, within reasonable limits, to elicit such facts as will enable him intelligently to exercise his right of peremptory challenge, and it is error for the court to exclude questions which are pertinent for either purpose * * *

■■■■ "We agree with the statement of counsel for the State that the question of a juror's qualification is addressed to the sound discretion of the trial judge. His ruling is, however, subject to review; and while it will be

sustained unless the discretion allowed him is shown to have been unwisely exercised, nevertheless considerable latitude must of necessity be allowed in the examination of jurors and the trial judge is without right to unduly curtail that examination." State v. Brazile, 229 La. 600, 86 So.2d 208, 210. See, LSA–R.S. 15:557.

"In reviewing the judge's ruling it is well to observe preliminarily that, under our law, the excusing of petit jurors for cause is within the discretion of the trial judge. Article 345, Code of Criminal Procedure (R.S. 15:-345); 1 Marr's Criminal Jurisprudence, 701, Sec. 462; State v. Kifer, 186 La. 674, 173 So. 169, 110 A.L.R. 1017, and State v. Hoover, 203 La. 181, 13 So.2d 784. Hence, the question presented under these bills is whether the judge abused his discretion in denying the challenges for cause." State v. Weston, 232 La. 766, 95 So.2d 305, 307. See, State v. Wilson, 240 La. 1087, 127 So.2d 158.

We shall determine the correctness of the trial judge's rulings as to the competency and eligibility of the prospective jurors, supra, in the light of the above statutes and jurisprudence.

In his Per Curiam to Bill of Exceptions No. 7, the trial judge said that in his discussion of Bill of Exceptions No. 7 he would treat the matter concerned with respect to all bills (Nos. 7, 8, 9, 10, 11, 12, 13, and 15), disposing of each bill separately by reference. He stated:

"The eight [6] men challenged for cause in these bills are all very well known to me and have been all their lives. I know them individually, I know their fathers and mothers, and in some instances I even know the grandfathers and the grandmothers. I know them personally, I know their reputation and the esteem in which they are held by others. They are the type of men in whom I have the utmost confidence and in whose words and actions I have no doubt. Not one of these men would perjure themselves in any manner whatsoever. The record disclosed that each of them is impartial in this case, and each has no bias or prejudice either for or against the defendant, and that none of them have any blood or marriage relation to the victim or her family, and that the only relation was that some of them knew either the victim or her husband or both, which relationship in the opinion of this Court was most remote, and certainly would lead anyone to believe that such relation would not influence the jurors in coming to a verdict."

6. We shall discuss Bill of Exceptions No. 13 separately; it concerns Mr. Fred Bordelon, the eighth juror mentioned.

We have stated, supra, the ruling of the trial judge with respect to Vories Morein, prospective juror.

With respect to the prospective juror J. D. Hardegroder, the trial judge stated:

"This juror could not subconsciously be influenced because he was a candidate for office in a distant ward. The record reflects and I know it to be a fact, that there are as many negro voters in that ward as there are in any other part of the parish on a pro-rata basis. I know this man would not be swayed consciously or subconsciously by considerations out of the record, had he been accepted as a juror, but even admitting for the sake of argument defendant's contention that he might be swayed, in view of the fact that there are a great number of negro voters in his Ward, it would be just as reasonable to suppose that he would be swayed against the State."

With respect to the prospective juror Lawrence Ardoin, the trial judge stated:

"A thorough consideration of the above voir dire examination of this prospective juror is proof conclusive of the eminent competency of this juror."

With respect to the prospective juror Abbey Fontenot, the trial court stated:

"The Court felt that the relationship of this prospective juror with the husband of the victim was remote indeed, since they seldom saw each other since the year of 1932, 18 years ago, despite the fact that they lived about ten miles apart."

With respect to the prospective juror Eumere Guillory, the trial court stated:

"This barber thoroughly qualified himself as a prospective juror in the mind of the Court, despite the fact that he knew the victim when she was a small child. His entire voir dire examination conclusively convinced me of his competency because of the type of man that he is as fully covered in my reasons to per curiam to Bill 7."

With respect to the prospective juror, Dudley Guillory, the trial court stated:

"The entire voir dire examination of this prospective juror convinces me to a certainty that he was competent."

With respect to the prospective juror Wilbert Ardoin, the trial court stated:

"I have a high regard for this prospective juror, as he is one of the finest of our young men. He would not lie."

◼ Our consideration of the voir dire examination of the prospective jurors involved in these bills discloses that the residents of Evangeline Parish acquire general knowledge of events happening therein. The accused was tried by a jury of his peers. We do not find that the trial judge abused his discretion in overruling the challenges for cause of Vories Morein, J. D.

Hardegroder, Lawrence Ardoin, Abbey Fontenot, Eumere Guillory, Dudley Guillory, and Wilbert Ardoin, nor that the defendant was prejudiced by his rulings.

Bills of Exceptions Nos. 7, 8, 9, 10, 11, 12, and 15, are without merit.

 Bill of Exceptions No. 13 was reserved to the trial court's overruling the defendant's challenge for cause of the prospective juror Fred Bordelon and its denial of his peremptory challenge of the same juror.

On voir dire, Fred Bordelon, a resident of Evangeline Parish for forty-six years, stated that he was in the wholesale grocery business and sold merchandise to Lumney Guillory, a childhood friend of his and husband of the deceased; that he had known the victim for about ten years before her death, but that this fact would not alter his decision if he were selected on the jury panel. Mr. Bordelon testified that he had discussed the instant offense slightly with relatives and friends, but that he had no fixed opinion about the case; that his decision would be no different in the instant matter from a decision he would make if a white person were on trial for killing a colored individual. This prospective juror affirmed that he felt that he could arrive at a proper decision after weighing the evidence presented.

Fred Bordelon was questioned extensively as to whether the facts that he had

been robbed four or five times and that charges for these offenses were handled by the district attorney's office would prejudice him against the defendant (the answer to the motion for a bill of particulars recites that the defendant was engaged in robbery). His testimony is as follows:

"Q. And were those charges prosecuted were some of them prosecuted? A. Well, I think they were guilty—plead guilty.

"Q. And they were all prosecuted, were they not? A. That's right.

"Q. And would that fact that your store has been robbed and there may be evidence tending to show that there was a robbery which the State alleges and will seek to prove during the commission of this alleged crime, would that fact cause you to have any feeling one way or the other against this defendant because there was a charge being robbery? A. No sir.

"Q. You feel confident that it could not? A. Well, he was not connected with the robbery in any way so as far as I know.

"Q. Well, if the State should introduce evidence tending to show that this defendant was connected with a robbery as well as the killing, would that fact cause any feeling against him one way or the other which would

otherwise not exist? A. What robbery, sir? You mean the robbery of my place?

"Q. I'm not trying to confuse you. Excuse me, Mr. Bordelon. What I mean is this: The robbery allegedly in this commission of this crime here they show that he was guilty of a robbery, too— A. Well, as a citizen or as an individual, naturally I'm not in sympathy with anybody who—

"Q. That's what I say but having been the victim of a robbery yourself, sir, several times you've explained. Would that fact then cause some extra feeling be it ever so slight that would not otherwise be there if you had not had this experience of being robbed yourself? A. Well, if I had never had the experience I wouldn't know just how I felt about it but having had the experience I am definitely opposed to robbery.

"Q. That's what I say. Wouldn't it have some little bearing in your decision one way or the other? A. Not in this case, no sir.

"Q. Looking at this case? A. Not in this case.

"Q. You feel that it would not make any difference at all? A. Not any more than any other robbery.

"Q. That's what I say, and having been the victim of a robbery and it will

probably be shown that it had been a part of this case, wouldn't that make a difference in your feeling than if it was something else he was charged with, do I make myself clear? A. No sir, you are quite clear but I am afraid I don't make myself clear. Definitely as I told you I am against any robbery or any other crime.

"Q. Every good citizen is. A. That's correct and whether it's my place or any other place I don't approve of it."

After the above testimony was adduced, counsel for the defendant argued:

"I know this gentleman is answering just as candidly and as truthfully as any man has ever answered in the Court Room, but having had the experiences that he has had in his own business and if the evidence is as the District Attorney has so far outlined in the motions that he has filed, it would be that way along that line, and it should hit this gentleman with its full impact I am afraid that this gentleman could not give the same consideration that he could if it was some other offense as some other juror and I submit on the basis of his examination a challenge for cause, without any argument."

The trial court overruled defendant's challenge for cause and denied him a

peremptory challenge because he had previously exhausted the peremptory challenges permitted to him by law. LSA–R.S. 15:354.

In this Court, counsel contend that Fred Bordelon was unqualified to serve as a petit juror because of friendship with the Guillorys; they argue that Bill of Exceptions No. 13 constitutes reversible error and when coupled with Bills Nos. 7, 8, 9, 10, 11, 12, and 15, the error is compounded. Counsel strenuously urged in oral argument that Fred Bordelon was unconsciously prejudiced against the defendant because of the juror's having experienced several robberies prior to the commission of the offense for which the defendant is charged.

The identical question presented herein was raised in the case of State v. Martinez, 220 La. 899, 57 So.2d 888, 891; 73 S.Ct. 58, 344 U.S. 843, 97 L.Ed. 656, wherein we held:—"There is nothing in the testimony of the juror nor evidence to show that the juror is prejudiced against the defendants. We cannot assume that he is biased against the defendants merely because his place of business had been burglarized." See, LSA–R.S. 15:350, 15:351.

The testimony of Fred Bordelon is replete to the effect that he was unprejudiced and could render a fair and impartial verdict in this prosecution. Therefore, Bill of Exceptions No. 13 is without merit.

Bill of Exceptions No. 16 was reserved to the trial court's denial of defendant's motion to have the entire testimony of the witness Oledaus Guillory stricken because of the alleged leading nature and continuity of the series of questions propounded and the State's attorney's pattern of procedure in asking them.

Deputy Sheriff Oledaus Guillory testified that he investigated the death of Mrs. Guillory shortly after its occurrence; he said that the body had clothes on it. The State propounded questions to the witness with respect to the condition of the victim's underclothing and adduced answers to the effect that the front part of the deceased's underpants was torn; certain questions to which counsel for the defendant objected to as leading questions were withdrawn by the State.

In answer to the defendant's motion for a bill of particulars, the State alleged that the defendant was charged with committing the murder of Mrs. Selma Vizinat Guillory by causing her death while engaged in the perpetration of armed robbery and simple robbery and aggravated rape. The questions asked required answers which would prove or disprove one of the foregoing facts.

We find that the evidence adduced by counsel for the State was relevant and material because of the nature of the crime charged and the answer given by the State to the motion for a bill of particulars. LSA–R.S. 15:435 and 441.

In his per curiam to the instant bill, the trial judge stated:

"The State's theory of the case was that defendant had both ravished and robbed the deceased, and then murdered her. The inquiry of the witness as to the condition of the under-garments of the deceased was both relevant and material. The witness obviously had some difficulty in describing the genitals of the deceased. Furthermore, the questions were not leading and were permissible." See, LSA–R.S. 15:373; State v. Grayson, 225 La. 142, 72 So.2d 457.

"It is within the sound discretion of the trial court to permit leading questions 'where it deems such course necessary or advisable,' and error cannot be predicated upon such ruling in the absence of palpable abuse of such discretion. 40 Cyc. 2427, 2429, verbo, 'Witness.'" State v. Fuller, 164 La. 718, 114 So. 606, 608; State v. Hollingsworth, 160 La. 26, 106 So. 662.

"* * * Considerable latitude must necessarily be left to the trial court in ruling upon the form of questions to witnesses, and while counsel should not be permitted to testify by putting the words in the witness' mouth, yet this court would not feel justified in disturbing the verdict of a jury on that ground, where the subject-matter of the questions was relevant, unless there was a clear abuse calculated to prejudice the rights of the accused. * *" State v. Allemand, 153 La. 741, 96 So. 552, 553; State v. Sheffield, 232 La. 53, 93 So.2d 691.

▬ We find that there was no evidence of any "pattern or first telling the witness what to say and then rephrasing the question eliciting the answer previously directed to the witness." Under the theory of the case, we do not find that the trial judge abused his discretion in not permitting the entire testimony of the witness to be stricken. Additionally, "Insofar as we have been able to ascertain, the Louisiana Code of Criminal Procedure does not provide for any such motion in the trial of a criminal case." State v. Saia, 212 La. 868, 33 So.2d 665, 668.

Bill of Exceptions No. 16 is without merit.

▬ Bill of Exceptions No. 17 was reserved to the trial court's denial of defendant's motion for a mis-trial based on the district attorney's action of conversing with the witness Oledaus Guillory while the jury was preparing to retire for a recess requested by counsel for the defense prior to their questioning of the witness after direct examination.

In this Court, counsel for the defendant reiterate their belief that the district attorney should not have done what he did,

however innocent it may have been, because of the fact that juries are easily influenced.

Defendant has shown no prejudice in the complaint urged;[7] there must appear prejudice to some of the defendant's substantial rights in order for this Court to grant the accused a new trial. State v..Fuller, 218 La. 872, 51 So.2d 305; LSA–R.S. 15:557.

Bill of Exceptions No. 17 is without merit.

■■■■ Bill of Exceptions No. 19 was reserved to the trial judge's overruling the objection of defendant's counsel to the testimony of Dr. Frank Savoy, Sr., Coroner, relative to the condition of the victim's underclothing or tending to show ravishment, predicated on the ground that the answer to the motion for a bill of particulars alleging that the State intended to prove rape was not read to the jury at the time that the indictment was read.

In his per curiam, the trial judge sets forth the circumstances associated with the instant bill. He states that when the defendant persisted in his objection to the testimony of the Coroner, he ordered that the bill of particulars be read to the jury even though defendant's counsel objected that such reading was not timely. He further states that the district attorney re-

quested that his opening statement be made a part of the per curiam, which statement recited that "the State intends to prove to you that Ora Lee Rogers first had a specific intent to kill or to inflict great bodily harm on Mrs. Selma Vizinat, Wife of Lumney Guillory, and then in addition that Ora Lee Rogers was engaged in the perpetration of armed robbery, armed simple robbery, and aggravated rape, when the death and the murder of Mrs. Selma Vizinat was committed. * * *"

Nowhere in LSA–R.S. 15:333, "Steps in trial," do we find any provision reciting that the jury shall have the answer to a motion for a bill of particulars read to it. In fact, "The sole office of a bill of particulars is to give the adverse party information which the pleadings by reason of their generality do not give and to compel the State to observe certain limitations in offering evidence. A bill of particulars can not change the offense charged nor in any way aid an indictment or information fundamentally bad. * * *" State v. Bienvenu, 207 La. 859, 22 So.2d 196, 198. See, State v. Peterson, 232 La. 931, 95 So.2d 608.

We have previously found that the testimony with respect to the alleged rape was relevant and material; under such circum-

---

7. The trial judge stated in his per curiam: "Apparently, counsel for the defendant was satisfied with whatever explanation the district attorney gave him as to the nature of the conversation had with the witness at the time of the occurrence, as he made no effort to interrogate either the witness or the district attorney for the record, and in aid of his motion for mistrial and bill of exception."

stances, the testimony of the coroner was admissible.

Bill of Exceptions No. 19 is without merit.

■ Bill of Exceptions No. 22 was reserved to the trial court's admission in evidence of defendant's confession.

At the time defendant's counsel objected to the introduction of the confession in evidence, the averment was made that the proper predicate had not been laid. The trial court ruled that the confession was admissible out of the presence of the jury and in the presence of the jury. In the present bill of exceptions reserved to the trial court's ruling, no specific ground is set forth for the objection to the admissibility of the confession in evidence. In brief counsel argues:

"Bill of Exceptions No. 22 was reserved to the Court's ruling that the defendant's confession was admissible over the objection of the defense.

"The defendant testified that the District Attorney, Mr. L. O. Fusilier, had induced him to make a confession by promising him leniency.

"This, of course, was vigorously denied by Mr. Fusilier.

"The bill is not abandoned but submitted without argument."

Our consideration of this bill will be directed to a determination of whether the defendant was induced to make a confession by promises of leniency.

The defendant's confession concludes: "This statement was given to L. O. Fusilier, District Attorney, before Eraste Vidrine, E. H. Malone, Jr., and Audley Vidrine, after having been first explained of my rights, without threats or promises, on this 1st day of May, 1959."

Outside of the presence of the jury, the defendant gave in part the following testimony:

"Q. Why did you make the statement? What was the reason if there was, did anybody threaten you? A. No sir.

"Q. Anybody promise you anything, and if so, who? A. Well, there was only one offer.

\* \* \* \* \* \*

"Q. All right, what was it and when, what part of the proceedings? A. Well, that was about I say about an hour and a half after we reached Alexandria.

"Q. Now then, you heard it testified that you were spoken to and then after that you were given something to eat and then you were questioned again. A. That's right.

"Q. Now when was the promise made to you? When during that time? When? And my whom? And under what circumstances? Suppose you re-

late it, son, just as it was. A. The offer was made to me after I finished eating.

"Q. By whom? A. Mr. L. O. Fusilier.

\* \* \* \* \* \*

"Q. That the District Attorney? A. That's right.

"Q. What if anything was said to you? A. Well, he told me if that if I gave them a confession to go ahead it would better it would be lighter on me and I would get a life sentence in the penitentiary, which would be ten years, six months.

"Q. Was that made before you ate and right after they had questioned you the first time or afterwards, when was it made? A. It was made after they questioned me the first time.

\* \* \* \* \* \*

"Q. When the promise was made to you, who was there? at the time? A. If I remember right, I think it was just he and I in the room."

When the attorney for the State questioned the defendant, he asked him:

"Q. When this was read to you, the part that says that no promises had been made to you, you remember that that was in the statement, don't you? You know that is in the statement? That no promises had been made to you? A. I know that.

"Q. When that was read to you, did you object to that part of the statement? A. Well, I'm going to be straight about that, I look at it this way, I figured he's the District Attorney and he knows what he was talking about, I mean that's why I didn't mention it.

"Q. That's the only reason you didn't mention it? A. That's right.

\* \* \* \* \* \*

"Q. But the District Attorney told you before you gave the statement that it could be used against you? A. That's right.

"Q. And at the time that you answered the questions, you knew that they could be used against you in the Court Room? A. Yes."

Audley Vidrine, Chief of Police of the City of Ville Platte, testified that he witnessed the statement (confession) of the defendant, being present at all times during the taking of the statement. He said that the defendant was asked if the statement was true and correct; that Rogers stated that it was and signed the statement.

Eraste Vidrine, Deputy Sheriff of the Parish of Evangeline, testified that he was present from the beginning of the statement, and that no promises were made to the defendant before or after the statement was taken.

E. H. Malone, Jr., the defendant's employer, testified that he was present the en-

tire time the statement was being taken and that he saw the defendant sign the statement; that no physical force, threats, or duress were used on the defendant to obtain the confession, and that no promise was made to him. Mr. Malone was of the opinion that the defendant understood the questions and talked clearly.

Being recalled by the State, Audley Vidrine and Eraste Vidrine testified that no force, threats, duress, intimidations, or promises were used to get the defendant to make the confession.

Cassie Beauboeuf, employed as a secretary by the Sheriff's Department of the Parish of Rapides, testified that the defendant's confession of May 1, 1959 was taken by her in Alexandria, Louisiana, on that date; that no force, threats, duress, intimidations, or promises were used to get the defendant to make the statement. In Miss Beauboeuf's opinion, the defendant was physically and mentally "apparently normal." She stated that he understood the questions (the statement or confession was in question and answer form), and that after the statement was read back to the defendant, he was asked if it was true and correct; that he replied that it was and signed the same.

The defendant testified that Mr. Fusilier, the district attorney, was alone with him for five or six minutes before he gave his statement of May 1, 1959.

On rebuttal, Eraste Vidrine, Audley Vidrine, and E. H. Malone, Jr., testified that at no time was District Attorney Fusilier alone with the defendant.

L. O. Fusilier, District Attorney, testified that he never did see the defendant alone, and that he never did speak to the defendant about ten and a half years in the penitentiary or anything like that. He said that he made the defendant no promises of leniency, and that he would never do such a thing. He affirmed that he made no threats against the defendant. Mr. Fusilier testified that he was present at the taking of the statement from the beginning until the end, and that he was the one who did all the questioning. He said that the defendant understood the questions very well and answered lucidly, freely, and voluntarily. He stated that the only emotion which the defendant displayed was the shedding of a couple of tears every now and then.

In his per curiam to the instant bill, the trial judge stated:

"It will be seen from the testimony taken out of the presence of the jury, the State proved beyond all reasonable doubt, and to the satisfaction of the court that defendant's statement, was his voluntary act, and, was not induced by any conduct on the part of the district attorney or the peace officers, to compel the making of same.

"Whether the statement be regarded as a confession of guilt or admission involving the existence of a criminal intent, or inculpatory facts tending to establish guilt of the crime charged, proper foundation was laid to admit of the admission in evidence.

\* \* \* \* \* \*

"In evaluating the truth of the contradictory statements of defendant, and the other witnesses as to the alleged 'offer' or promise, the court concluded that the defendant was untruthful, and that no such promise or 'offer' was made to the defendant, nor was he ever alone with the district attorney at any time."

"\* \* \* Our law provides that, before any confession can be introduced in evidence, the State must affirmatively prove that it was freely and voluntarily given and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. Article 451 and 452, Code of Criminal Procedure (R.S. 15:451, 452) and Section 11 of Article 1 of the Constitution of 1921. And it is established by our jurisprudence that, before what purports to be a confession can be received in evidence, it must be shown by proof which convinces beyond a reasonable doubt that it is voluntary. State v. Wilson, 214 La. 317, 37 So.2d 804; State v. Robinson, 215 La. 974, 41 So.2d 848; State v. Honeycutt, 216 La. 610, 44 So.2d 313; State v. Green, 221 La. 713, 60 So.2d 208 and State v. Michel, 225 La. 1040, 74 So.2d 207." State v. Weston, 232 La. 766, 95 So.2d 305, 310. See, State v. Savell, 238 La. 758, 116 So.2d 513; State v. Stewart, 238 La. 1036, 117 So. 2d 583; State v. Wilson, 240 La. 1087, 127 So.2d 158.

The question of the admissibility of a confession is for the judge, its effect for the jury, and whether a sufficient basis was laid for the admission of an alleged voluntary confession is a question of fact upon which the ruling of the trial judge will not be disturbed unless clearly against the preponderance of the evidence. See, State v. Cook, 215 La. 163, 39 So.2d 898; State v. Hilliard, 227 La. 208, 78 So.2d 835." State v. Domino, 234 La. 950, 102 So. 2d 227, 229.

We find that the defendant's statement was free and voluntary and was not made under the influence of inducements or promises; it was free from the influence of fear, duress, intimidation, menaces, or threats. LSA–R.S. 15:451. The defendant was not subjected to any treatment designed by effect on body or mind to compel a confession of crime. LSA–R.S. 15:452. These findings are affirmed by the uncontradicted testimony of record.

Bill of Exceptions No. 22 is without merit.

Bill of Exceptions No. 24 was reserved to the trial court's overruling defendant's motion for a new trial. The motion was predicated on the following three grounds:

1. The verdict is contrary to the law and the evidence, there being no evidence to justify the return of a verdict of guilty.

2. Bills of Exceptions Nos. 1 through 23 represent objections entitling defendant to a new trial.

3. Since the trial of the case, newly discovered evidence concerning the systematic exclusion of negroes from the jury venire became available to counsel for the defendant.[8]

The first two grounds present nothing new for our consideration; neither the appellate nor supervisory jurisdiction of the Supreme Court can be invoked to review the granting or the refusal to grant a new trial except for error of law. LSA–R.S. 15:516. We have carefully read the testimony attached to the bills of exceptions urged in this Court and find that there was evidence adduced upon the trial in support of the offense with which defendant was charged. "But this court has not jurisdiction to decide questions of fact on which depend the guilt or innocence of the defendant in a criminal prosecution. On

those questions the decision of the trial judge on a motion for a new trial is final. It is only in cases where there is no evidence at all tending to prove a particular fact which is essential to a valid conviction that this court may set aside the conviction for want of proof of the guilt of the defendant. * * *" State v. Martinez, 201 La. 949, 10 So.2d 712; State v. Tucker, 204 La. 463, 15 So.2d 854; State v. Linkletter, 239 La. 1000, 120 So.2d 835.

Those bills urged in this Court have been previously discussed; we have affirmed the rulings of the trial judge.

In the motion for a new trial, defendant's counsel averred:

"* * * evidence has come to the attention of counsel since the trial of this case which shows conclusively an intentional systematic exclusion of negroes from the petit juries of this Parish for many, many years and particularly in the instant case. The recent election showed the number of negro votes in the parish (all since the trial of this case), and a check by census by examining the records and the testimony of the jury commissioners, which will be offered in support hereof, and the Registrar of Voters, shows that the negroes on the petit jury

---

8. The State urges that this is not newly discovered evidence. In view of the seriousness of the case, we prefer, as did the trial judge, to pass upon the merits of appellant's complaint.

in this and all other cases tried for the past many years were but a token attempt to conform the law as presently set out by United States Supreme Court decisions, rather than an attempt to grant a person charged (particularly a negro) a trial by jury wherein men of his own race would have a fair percentage on the petit jury and as thus stated would have a voice in the deliberations backed possibly by others of their race, rather than by a mere one or two entities on a jury, where they could and would be cowed, brow beaten and their decision amount to nothing. That testimony to be taken on the trial of this motion for a new trial will conclusively prove the above and hence your defendant has been deprived of a fair trial by jury as guaranteed to him under both the State and Federal Constitutions."

Counsel contend that a Federal question per se and a question of law are presented. They urge that the defendant was deprived of due process of law and equal protection of the law during the proceedings had, as guaranteed to him under the Constitution of our State and of the United States of America.

The 1960 Census Returns were not available to the defendant nor the State at the time the motion for a new trial was filed. This fact is confirmed by a letter from the Department of Commerce, Bureau of the Census, Washington, D. C., wherein it is

stated that the preliminary 1960 population count of Evangeline Parish was 31,510, such figures being subject to revision. The letter further states that tables showing the White and Negro population, as well as years of school completed by persons 25 years old and over, by color, for Evangeline Parish for 1950, were being transmitted to the District Attorney. The Census Report for 1950 recites:

```
"Total Population ........................... 31,629
Male ....................................... 15,962
Male White ................................. 12,168
Male Negro ................................. 3,793
Male (others) .............................. 1
Female ..................................... 15,667
Female White ............................... 11,905
Female Negro ............................... 3,760
Females (other) ............................ 2
Persons 21 years or older .................. 17,010
Male 25 years or over ...................... 7,240
No School year completed ................... 1,850
Elementary: 1 to 4 yrs. .................... 2,090
 5 to 8 yrs. .................... 1,850
High School: 1 to 3 yrs. ................... 585
 4 yrs. ........................ 390
College: 1 to 3 yrs. ................... 150
 4 yrs. or more ................ 130
School years not reported .................. 195
Median School years completed ............. 4.2
Total (non-white) Population ............... 7,556
Non-White 25 years and over ................ 2,510
Non-White No School Year completed ......... 1,345
Elementary: 1 to 4 years ................... 745
 5 to 8 years ................... 320
High School: 1 to 3 years .................. 10
 4 years ....................... 5
College: 1 to 3 years .................. 15
 4 years or more ............... 10
School years not reported .................. 60
Median School years completed ............. 0.9"
```

Jury Commissioners Rene Veillon, who had served on the Jury Commission for five or six years; Evariste Young, who had served on the Jury Commission for about twenty-five years; and Arcelus Guillory, who had served on the Jury Commission

for about fourteen years, testified that in the selection of the general venire list they considered the competency of the individuals and not their color. LSA–R.S. 15:172. Their testimony was replete to the effect that a large part of the colored population of Evangeline Parish was uneducated, not being able to read and write. Mr. Veillon stated that he considers the ability of prospective jurors to read and write when selected to serve on the general venire. The substance of the testimony of these Jury Commissioners is that at least 25% of the names of the general venire were those of colored persons; they stated with definiteness that no discrimination was practiced in the selection of the general venire.

Otis Fontenot, Registrar of Voters for over thirteen years, testified that the registered voters for 1960 numbered 17,462, 3,-388 of them being colored; that for 1956 the registration was 15,743, 3,058 being colored; and that for 1954 the registration was 14,541, 2,922 being colored. In speaking of the 1960 registration, Mr. Fontenot said that out of 14,074 whites, 2,164 were illiterate, and out of 3,388 Negroes, 1,614 were illiterate.

An examination of the statistics attached to the instant bill convinces us that there was no discrimination nor systematic exclusion of Negroes from the petit juries of the Parish of Evangeline. The trial judge stated in his per curiam to the instant bill that, "the Court has examined the panel and found that there were at least four persons of the Negro race on the panel and that actually two Negroes actually were called and served on the grand jury which indicted the defendant therein." See, State v. Scott, 237 La. 71, 110 So.2d 530, 534, certiorari denied, 361 U.S. 834, 80 S.Ct. 85, 4 L.Ed. 2d 75; State v. Wilson, 240 La. 1078, 127 So.2d 158.

We do not find that the defendant sustained his allegation that Negroes were systematically excluded from the general venires and jury panels of Evangeline Parish. The record conclusively affirms that his constitutional rights have not been violated.

Bill of Exceptions No. 24 is without merit.

For the reasons assigned, the conviction and sentence are affirmed.

HAWTHORNE, J., does not participate.